# TRUST INDENTURE

Dated as of August 1, 2006

between

## ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY

and

## WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee

**TABLE OF CONTENTS**

Parties and Preambles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| SECTION 1.01. | Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 5 |
| SECTION 1.02. | Content of Certificates and Opinions . . . . . . . . . . . . . . . | Page 19 |
| SECTION 1.03. | Article and Section Headings and References . . . . . . . . | Page 19 |
| SECTION 1.04. | Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 20 |

## ARTICLE II
## THE BONDS

| | | |
|---|---|---|
| SECTION 2.01. | Authorization of Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 20 |
| SECTION 2.02. | Terms of Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 20 |
| SECTION 2.03. | Execution of Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 21 |
| SECTION 2.04. | Transfer and Exchange of Bonds . . . . . . . . . . . . . . . . . . . | Page 22 |
| SECTION 2.05. | Book-Entry System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 23 |
| SECTION 2.06. | Bond Register . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 24 |
| SECTION 2.07. | [Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 24 |
| SECTION 2.08. | Bonds Mutilated, Lost, Destroyed or Stolen . . . . . . . . . . | Page 25 |
| SECTION 2.09. | Disposition of Cancelled Bonds . . . . . . . . . . . . . . . . . . . . | Page 25 |

## ARTICLE III
## ISSUANCE OF BONDS; APPLICATION OF PROCEEDS;
## ESTABLISHMENT OF COSTS OF ISSUANCE FUND;
## ESTABLISHMENT AND APPLICATION OF PROJECT FUNDS

| | | |
|---|---|---|
| SECTION 3.01. | Authentication and Delivery of Bonds . . . . . . . . . . . . . . . | Page 25 |
| SECTION 3.02. | Application of Proceeds of Bonds . . . . . . . . . . . . . . . . . . | Page 25 |
| SECTION 3.03. | Establishment and Application of Costs of Issuance Fund | Page 26 |
| SECTION 3.04. | Establishment and Application of Project Fund . . . . . . . . | Page 26 |

## ARTICLE IV
## REDEMPTION

| | | |
|---|---|---|
| SECTION 4.01. | Terms of Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 27 |
| SECTION 4.02. | Selection of Bonds for Redemption . . . . . . . . . . . . . . . . . | Page 30 |
| SECTION 4.03. | Notice of Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Page 30 |

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page i

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 2 of 50

SECTION 4.04.   Partial Redemption of Bonds ...................... Page 31
SECTION 4.05.   Effect of Redemption .......................... Page 31

ARTICLE V
PLEDGE AND ASSIGNMENT; ESTABLISHMENT OF FUNDS AND ACCOUNTS

SECTION 5.01.   Pledge and Assignment .......................... Page 32
SECTION 5.02.   Bond Fund....................................... Page 33
SECTION 5.03.   Replacement Reserve Fund ....................... Page 35
SECTION 5.04.   Rebate Fund .................................... Page 35
SECTION 5.05.   Reserve Fund ................................... Page 38
SECTION 5.06.   Investment of Moneys in Funds .................. Page 38
SECTION 5.07.   Amounts Remaining in Funds and Accounts ........ Page 40

ARTICLE VI
COVENANTS

SECTION 6.01.   Faithful Performance ........................... Page 40
SECTION 6.02.   Extension of Payment of Bonds .................. Page 40
SECTION 6.03.   Lien of Indenture .............................. Page 41
SECTION 6.04.   Validity of Issuer Actions ..................... Page 41
SECTION 6.05.   Pledge of the State ............................ Page 41
SECTION 6.06.   Accounting Records and Financial Statements ..... Page 41
SECTION 6.07.   Tax Covenants .................................. Page 42
SECTION 6.08.   Other Covenants, Amendment of Certain Agreements .. Page 42
SECTION 6.09.   The Guaranty ................................... Page 43
SECTION 6.10.   Further Assurances ............................. Page 43
SECTION 6.11.   Continuing Disclosure .......................... Page 43
SECTION 6.12.   Annual Notice of Principal Outstanding ......... Page 44

ARTICLE VII
EVENTS OF DEFAULT; REMEDIES ON DEFAULT

SECTION 7.01.   Events of Default; Acceleration; Waiver of Default ...... Page 44
SECTION 7.02.   Institution of Legal Proceedings by Trustee ........... Page 46
SECTION 7.03.   Application of Moneys Collected by Trustee .......... Page 46
SECTION 7.04.   Effect of Delay or Omission to Pursue Remedy ........ Page 47
SECTION 7.05.   Remedies Cumulative ............................ Page 47
SECTION 7.06.   Trustee Appointed Agent for Bondholders ............ Page 47
SECTION 7.07.   Power of Trustee to Control Proceedings ............. Page 47
SECTION 7.08.   Limitation on Bondholders' Right to Sue ............ Page 48

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 3 of 50

## ARTICLE VIII
## THE TRUSTEE

SECTION 8.01.    Duties, Immunities and Liabilities of Trustee . . . . . . . . .    Page 48
SECTION 8.02.    Merger or Consolidation . . . . . . . . . . . . . . . . . . . . . . . . .    Page 50
SECTION 8.03.    Rights of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 50
SECTION 8.04.    Right of Trustee to Rely on Documents . . . . . . . . . . . . .    Page 51
SECTION 8.05.    Preservation and Inspection of Documents . . . . . . . . . .    Page 52
SECTION 8.06.    Compensation and Indemnification of Trustee . . . . . . . .    Page 52

## ARTICLE IX
## MODIFICATION OF INDENTURE

SECTION 9.01.    Modification without Consent of Bondholders . . . . . . . .    Page 52
SECTION 9.02.    Modification with Consent of Bondholders . . . . . . . . . . .    Page 53
SECTION 9.03.    Effect of Supplemental Indenture . . . . . . . . . . . . . . . . . .    Page 54
SECTION 9.04.    Opinion of Counsel as to Supplemental Indenture . . . . . .    Page 55
SECTION 9.05.    Notation of Modification on Bonds; Preparation
                 of New Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 55

## ARTICLE X
## DISCHARGE OF LIEN OF INDENTURE

SECTION 10.01.    Discharge of Lien of Indenture by Payment of Bonds . . .    Page 55
SECTION 10.02.    Discharge of Lien of Indenture by Defeasance . . . . . . . .    Page 55
SECTION 10.03.    Effect of Discharge of Lien of Indenture . . . . . . . . . . . . .    Page 56
SECTION 10.04.    Unclaimed Money to be Returned . . . . . . . . . . . . . . . . . .    Page 57

## ARTICLE XI
## MISCELLANEOUS

SECTION 11.01.    Liability of Issuer Limited to Revenues . . . . . . . . . . . . . .    Page 58
SECTION 11.02.    Successor Is Deemed Included in All References
                 to Predecessor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 58
SECTION 11.03.    Limitation of Rights to Parties and Bondholders . . . . . . . .    Page 58
SECTION 11.04.    Waiver of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 58
SECTION 11.05.    Destruction of Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 59
SECTION 11.06.    Severability of Invalid Provisions . . . . . . . . . . . . . . . . . . .    Page 59
SECTION 11.07.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 59
SECTION 11.08.    Evidence of Rights of Bondholders . . . . . . . . . . . . . . . . .    Page 60
SECTION 11.09.    Disqualified Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Page 60
SECTION 11.10.    Money Held for Payment of Bonds . . . . . . . . . . . . . . . . . .    Page 61

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 4 of 50

SECTION 11.11.    Funds and Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Page 61
SECTION 11.12.    Waiver of Personal Liability  . . . . . . . . . . . . . . . . . . . . . . .   Page 61
SECTION 11.13.    Execution in Several Counterparts . . . . . . . . . . . . . . . . .   Page 61
SECTION 11.14.    Governing Law; Venue . . . . . . . . . . . . . . . . . . . . . . . . . .   Page 61
SECTION 11.15.    Complete Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . .   Page 61
SECTION 11.16.    Action to be Taken on Days Other Than Business Days .   Page 61

APPENDIX A        -        Form of Bond - Tax-Exempt
APPENDIX B        -        Form of Bond - Taxable
APPENDIX C        -        Form of Disbursement Request

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 5 of 50

THIS INDENTURE, made and entered into as of August 1, 2006, by and between the ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY (the "Issuer"), a public corporation of the State of Alaska (the "State") and a body corporate and politic constituting a political subdivision within the Department of Commerce, Community, and Economic Development, but with separate and independent legal existence, and WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee (the "Trustee"), a national banking association organized under the laws of the United States of America, having a corporate office in Portland, Oregon.

## WITNESSETH:

WHEREAS, the Issuer is authorized by Alaska Statutes 44.88, as amended (the "Act"), to issue revenue bonds for the purpose of providing funds to pay the costs of acquiring, constructing, and equipping projects in the State provided that the user of the project financed with the proceeds of the bonds agrees to pay the Issuer an amount at least sufficient to pay the principal of, and the premium, if any, and interest on, said bonds and other expenses incurred by the Issuer in connection therewith; and

WHEREAS, Anchorage Sportsplex, Inc. (as more particularly defined herein, the "Borrower"), an Alaska nonprofit corporation and 501(c)(3) organization under the Internal Revenue Code of 1986, as amended (the "Borrower"), has applied to the Issuer for financial assistance for the purpose of financing the costs of acquiring, developing and constructing an approximately 177,000 square foot multi-use sports facility with an inflatable dome (the "Project"), to be located on approximately 12 acres near the corner of Raspberry Road and Minnesota Drive in the Municipality of Anchorage, Alaska (the "Municipality") and to pay certain related expenses; and

WHEREAS, the Issuer has determined to issue its Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Tax-Exempt Series 2006A (as more particularly defined herein, the "Series 2006A Bonds"), in an aggregate principal amount of Eleven Million Five Thousand Dollars ($11,005,000) and its Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Taxable Series 2006B (as more particularly defined herein, the "Series 2006B Bonds" and together with the Series 2006A Bonds, the "Bonds") in an aggregate principal amount of Five Hundred Five Thousand Dollars ($505,000) to provide funds for the purposes described above; and

WHEREAS, the Issuer will make a loan of the proceeds of the Bonds to the Borrower (the "Loan") pursuant to the terms of, and subject to the conditions set forth in the Loan Agreement between the Issuer and the Borrower dated August 1, 2006 (the "Agreement" or "Loan Agreement"); and

WHEREAS, the Bonds shall be special and limited obligations of the Issuer, payable by the Issuer solely from the receipts, funds or moneys to be derived by the Issuer under

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 6 of 50

this Indenture, including any supplements hereto, and the Loan Agreement and Promissory Note, including any supplements or amendments to either of them; and

**WHEREAS**, all Bonds shall be equally and ratably secured by this Indenture without priority or preference of any Bond over any other Bond; and

**WHEREAS**, none of the Bonds shall constitute an indebtedness or other liability of the State or of a political subdivision of the State (other than the Issuer, and then only to the extent stated in the preceding clauses of these Recitals), and neither the full faith and credit nor the taxing power of the Issuer, the State, or any political subdivision of the State will be pledged for the payment of any of the Bonds; and

**WHEREAS**, the Issuer and the Borrower will enter into the Loan Agreement to set forth the terms of the Loan; and

**WHEREAS**, the Loan Agreement requires the Borrower to make or cause to be made payments in amounts and at times sufficient to pay the principal of, and the premium, if any, and interest on, the Bonds when due; and

**WHEREAS**, the Borrower will deliver the Promissory Note to the Issuer, to evidence the Borrower's obligation to repay the Loan, which the Issuer will endorse and deliver to the Trustee in accordance with the Loan Agreement; and

**WHEREAS**, the Borrower has approved the terms of this Indenture, and has authorized the execution and delivery of the Promissory Note and the Loan Agreement, and has consented to the assignment of the Promissory Note to the Trustee as security for payment of the Bonds; and

**WHEREAS**, the acceptance of the Promissory Note, the execution and delivery of the Loan Agreement and this Indenture, and the sale, execution, authentication, issuance and delivery of the Bonds have been in all respects duly and validly authorized by the Issuer pursuant to a resolution adopted on July 10, 2006; and

**WHEREAS**, the Governor of the State has approved the issuance of the Series 2006A Bonds following a public hearing relating thereto, held upon reasonable public notice; and

**WHEREAS**, all things necessary to make the Bonds, when authenticated and issued as provided in this Indenture, valid, binding, and legal special obligations of the Issuer and to constitute this Indenture a valid, binding, and legal instrument for the security of all Bonds, enforceable in accordance with its terms, have been done and performed;

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 7 of 50

## NOW, THEREFORE, THIS INDENTURE FURTHER WITNESSETH:

That the Issuer, in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, of the purchase and acceptance of the Bonds by the Holders thereof, and of the issuance of the Guaranty by the Guarantor, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds are to be issued, executed, authenticated, delivered, secured, and accepted by all Persons who shall from time to time be or become Holders thereof, and in order to secure the payment of all the Bonds at any time issued and Outstanding, and the interest and the premium, if any, thereon according to their tenor, purport, and effect, and in order to secure the performance and observance of all the covenants, agreements, and conditions therein and herein contained, has executed this Indenture and does hereby grant a lien against and a security interest in, and does hereby release, assign, transfer, delegate, grant, and convey unto the Trustee and its successors and assigns forever, without recourse, the Trust Estate as set forth (the "Trust Estate"), to wit:

## GRANTING CLAUSES

A.     All right, title, and interest of the Issuer in and to, and its rights, duties and obligations under, the Loan Agreement (subject to certain reservations and exceptions noted in Section 28 of the Loan Agreement) and the Promissory Note, including, but not limited to, the present and continuing right under the Loan Agreement and the Promissory Note (i) to make claim for, collect or cause to be collected, receive or cause to be received all sums payable or receivable thereunder, (ii) to bring actions and proceedings thereunder or for the enforcement thereof, and (iii) to do the things which the Issuer is or may become entitled to do under the Loan Agreement and the Promissory Note;

B.     All right, title, and interest of the Issuer in and to the Revenues;

C.     Except as limited in this paragraph C, all Funds and Accounts created under this Indenture, and the amounts on deposit therein from time to time, subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions as set forth herein; provided, however, that the pledge set forth in this paragraph C does not include the Rebate Fund, and the amounts on deposit therein from time to time, which are not pledged under this Indenture as security for the Bonds.

D.     Any and all other property or interests therein, of every name and nature from time to time hereafter by delivery or by writing of any kind specifically conveyed, pledged, assigned, or transferred, or security interests with respect thereto granted, to the Trustee as and for additional security hereunder for the Bonds by the Issuer or the Borrower or by anyone on their behalf or with their written consent in favor of the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

TO HAVE AND TO HOLD all said properties, real, personal, and mixed, tangible and intangible, pledged, assigned, and conveyed as aforesaid, or intended so to be, unto the Trustee and its successors in trust and its assigns forever;

In consideration of the purchase and acceptance of any and all of the Bonds by the Holders thereof from time to time and the issuance of the Guaranty, this Indenture shall be deemed to be and shall constitute a contract among the Issuer, the Trustee, the Holders from time to time of the Bonds, and the Guarantor; and the conveyance made in this Indenture and the covenants set forth herein to be performed by the Issuer shall be for the equal and ratable benefit, security and protection of all Holders of the Bonds, without privilege, priority, or distinction as to any Bond over any other Bond;

IN TRUST, upon the terms and trusts herein set forth, as follows:

FIRST, as to the money and investments, if any, in any fund or account (other than the Rebate Fund) created hereunder (until such money and investments have been expended or transferred as provided herein) for the protection and benefit of the Holders, present and future, of the Bonds, equally and ratably, without preference, priority, or distinction of any such Holder over any other such Holder by reason of priority in issuance or acquisition or otherwise, as if all the Bonds at any time Outstanding had been sold, executed, authenticated, delivered, and negotiated simultaneously with the execution and delivery hereof; and

SECOND, as to the remainder of the Trust Estate, for the protection and benefit of the Holders of the Bonds equally and ratably, without preference, priority, or distinction of any such Holder over any other such Holder by reason of priority in issuance or acquisition or otherwise, as if all the Bonds at any time Outstanding had been sold, executed, authenticated, delivered, and negotiated simultaneously with the execution and delivery hereof;

PROVIDED, HOWEVER, that if (1) all of the principal of, and premium, if any, and interest on, the Bonds shall be paid at the times and in the manner mentioned herein, or shall be defeased as permitted hereby, and (2) all payments required to be made to the United States Treasury in respect of the Rebate Amount shall have been paid or provided for as provided herein, and (3) the Trustee and the Issuer shall have been paid all sums of money required to be paid to them in accordance with the terms and provisions of this Indenture, the Loan Agreement, and the Promissory Note, then, upon such final payments or provision for such payments being made, the lien of this Indenture and the rights hereby granted shall cease, terminate, and be void; otherwise, this Indenture shall be and remain in full force and effect;

THIS INDENTURE FURTHER WITNESSETH, that the Issuer hereby agrees and covenants with the Trustee for the benefit of the respective Holders from time to time of the Bonds, as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01. Definitions. Unless the context otherwise requires the terms defined in this Section 1.01 shall, for all purposes of this Indenture and of any indenture supplemental hereto, have the meanings herein specified, to be equally applicable to both the singular and plural forms of any of the terms herein defined.

The term "Act" means the Alaska Statutes 44.88, as amended from time to time.

The term "Accountant" means an independent certified public accountant, or a firm of independent certified public accountants.

The term "Additional Indebtedness" means any Long-Term Indebtedness and Short-Term Indebtedness incurred by the Borrower subsequent to the sale of the Bonds.

The term "Additional Payments" means the payments to be made by the Borrower to the Trustee or the Issuer in accordance with Section 6 of the Agreement.

The terms "Agreement" or "Loan Agreement" mean that certain loan agreement, dated as of the date hereof, between the Issuer and the Borrower, as originally executed or as it may from time to time be supplemented, modified or amended subject to and in accordance with the terms thereof and of Section 6.08(b) of this Indenture.

The term "Annual Debt Service" means for each Fiscal Year the sum of:

      (i)     all interest due in such year on all outstanding Series 2006A Bonds;

      (ii)    the principal of all Series 2006A Bonds due in such year; and

      (iii)   the sinking fund requirements for the Series 2006A Bonds, if any, for such year.

The term "Authorized Denominations" means $5,000 or any amounts in excess thereof in even $5,000 increments.

The term "Base Loan Payments" means the payments required to be made by the Borrower to the Trustee for the account of the Issuer in accordance with Section 5 of the Agreement for the payment of the principal (whether at maturity, upon acceleration or upon prior redemption) of and interest to the date of maturity or redemption, and premium, if any, on the Bonds.

The term "Beneficial Owner" means, with respect any Book-Entry Bond, the beneficial owner of such Bond as determined in accordance with the applicable rules of the

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 10 of 50

Securities Depository for the Bonds.

The term "Bond Account" means the account established pursuant to Section 5.02(a) of this Indenture.

The term "Bond Fund" means the fund by that name established pursuant to Section 5.02 of this Indenture.

The term "Bondholder," "Registered Owner," or "Holder" means, with respect to any of the Bonds, the person in whose name such Bond is registered.

The term "Bonds" means, the Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Tax-Exempt Series 2006A Bonds and the Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Taxable Series 2006B Bonds, each issued hereunder.

The term "Bond Register" means the books for the registration of ownership of the Bonds, and the transfer of ownership of the Bonds, maintained by the Trustee pursuant to Section 2.06 of this Indenture.

The term "Book-Entry Bonds" means any Bonds which are then held in book-entry form by a Securities Depository as provided in Section 2.05 of this Indenture.

The term "Borrower" means Anchorage Sportsplex, Inc., a nonprofit corporation organized and existing under the laws of the State and a 501(c)(3) organization under the Code, and its successor or assigns.

The term "Borrower's Tax Certificate" means the Tax Certificate executed by the Borrower dated the Issuance Date of the Bonds, as the same may be amended or supplemented in accordance with its terms, including the exhibits thereto.

The term "Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in the city in which the Principal Corporate Trust Office of the Trustee is located or in New York, New York or the State are authorized or obligated by law or executive order to be closed.

The terms "Certificate of the Issuer," "Order of the Issuer," or "Request of the Issuer" mean respectively, a written certificate, order, or request of the Issuer signed by or on behalf of the Issuer by its Executive Director, Assistant Secretary, any member of the Board of Directors of the Issuer, or by any other person who is specifically authorized by a written instrument of the Issuer signed by said Executive Director, said Assistant Secretary or any such member, to execute such a document on its behalf.

The terms "Certificate of the Borrower," "Consent of the Borrower," "Request of the Borrower," "Requisition of the Borrower," or "Statement of the Borrower" mean respectively, a written certificate, consent, request, requisition or statement of the Borrower executed by its Executive Director, any officer of the Board of Directors of the Borrower, or such other person as may be designated by any of such officials to sign for the Borrower.

The term "Code" means the Internal Revenue Code of 1986, as amended, and any regulations in effect or promulgated thereunder and any successor provisions of law. References to a particular Section of the Code shall be deemed to be a reference to any successor to any Section.

The term "Consumer Price Index" means the consumer price index for all urban consumers as published from time to time by the United States Department of Labor, Bureau of Labor Statistics.

The term "Continuing Disclosure Agreement" means that certain Continuing Disclosure Agreement of the Borrower, dated the date of issuance and delivery of the Bonds, as originally executed and as it may be amended from time to time in accordance with the terms thereof.

The term "Costs of Issuance" means all items of expense directly or indirectly payable by or reimbursable to the Borrower and related to the original authorization, execution, sale, and delivery of the Bonds including but not limited to costs of preparation and reproduction of documents, fees, and expenses of the Issuer, initial fees expenses and charges of the Trustee and its counsel legal fees, and charges of bond counsel, rating agency fees, bond insurance premium, and any other costs, charges or fees in connection with the original delivery of the Bonds.

The term "Costs of Issuance Fund" means the fund by that name established pursuant to Section 3.03 hereof.

The term "Credit Facility" means a line of credit or other similar credit facility established in accordance with the terms of Section 16(n) of the Agreement.

The term "Dated Date" means August 1, 2006.

The term "Deed of Trust" means that certain Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases, and Fixture Financing Statement, dated as of August 1, 2006, or such other date in the event of a Deed of Trust Property substitution, to be executed by the Borrower, as trustor, in favor of the Deed Trustee, for the benefit of the Trustee, as amended, modified and supplemented from time to time.

The term "Deed of Trust Property" means all property subject, on the date of

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 12 of 50

delivery of the Bonds, or at any time while the Bonds are Outstanding, to the Deed of Trust, as set forth therein.

The term "Deed Trustee" means the person at the time serving as such under the Deed of Trust.

The term "Defeasance Deposit" means the irrevocable deposit with the Trustee of cash (insured at all times by the Federal Deposit Insurance Corporation) or Defeasance Obligations in order to provide for the payment of all or a portion of the principal of, and the premium, if any, and interest on, any Bonds in accordance with, and simultaneously meeting all the requirements of, Section 10.02 hereof.

The term "Defeasance Obligations" means, with respect to the Bonds, obligations of, or obligations guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States including:

    (i)     United States treasury obligations;
    (ii)    All direct or fully guaranteed obligations;
    (iii)   Farmers Home Administration;
    (iv)    General Services Administration;
    (v)     Guaranteed Title XI financing;
    (vi)    Government National Mortgage Association ("GNMA"); and
    (vii)   State and Local Government Series.

Any security used for defeasance must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date).

The term "Determination of Taxability" means the occurrence or existence of any of the conditions or events described in Section 8(c) of the Loan Agreement.

The term "Disbursing Agent" means Fidelity Title Agency of Alaska, LLC in its capacity as disbursing agent under the Disbursing Agreement.

The term "Disbursing Agreement" means the agreement by and among the Borrower, the Trustee, and Title dated as of August 1, 2006.

The term "DTC" means The Depository Trust Company and its successors and assigns.

The terms "DTC Participants" or "Participants" means those broker-dealers, banks and other financial institutions from time to time for which DTC holds Bonds as Securities

Depository.

The term "Eligible Securities" means any of the following that at the time are lawful investments under the laws of the State and applicable banking regulations for the money held pursuant to the Indenture:

(a)     Government Obligations;

(b)     Direct and general obligations of any state of the United States of America or any municipality or political subdivision of such state, or obligations of any corporation, if such obligations are rated in one of the two highest rating categories by S&P or Moody's, or, upon the discontinuance of either or both of such rating agencies, any other nationally recognized rating service;

(c)     Negotiable or non-negotiable certificates of deposit, time deposits, or other similar banking arrangements, issued by any nationally or state chartered bank (including the Trustee and its affiliates) or trust company or any savings and loan association, domiciled in the State if either (i) the long-term obligations of such bank or trust company are rated in one of the two highest rating categories by S&P or Moody's, or upon the discontinuance of either or both of such rating services, any other nationally recognized rating service or (ii) the deposits are continuously secured as to principal, but only to the extent not insured by the Federal Deposit Insurance Borrower, or similar corporation chartered by the United States of America, (1) by lodging with a bank or trust company, as collateral security, obligations described in paragraph (a) or (b) above or, with the approval of the Trustee, other marketable securities eligible as security for the deposit of trust funds under applicable regulations of the Comptroller of the Currency of the United States of America or applicable state law or regulations, having a market value (exclusive of accrued interest) not less than the amount of such deposit, or (2) if the furnishing of security as provided in clause (1) of this paragraph is not permitted by applicable law, in such manner as may then be required or permitted by applicable state or federal laws and regulations regarding the security for the deposit of trust funds;

(d)     Repurchase agreements with respect to obligations listed in paragraph (a) or (b) above if entered into with a nationally or state-chartered bank domiciled in the State (including the Trustee), trust company domiciled in the State or a broker or dealer (as defined by the Securities Exchange Act of 1934, as amended) which is a member of the Securities Investors Protection Corporation if(i) such obligations that are the subject of such repurchase agreement are delivered to the Trustee or are supported by a safekeeping receipt issued by a depository satisfactory to the Trustee, provided that such repurchase agreement must provide that the value of the underlying obligations shall be maintained at current market value, calculated no less frequently than monthly, of not less than the repurchase price, (ii) a prior perfected security interest in the obligations which are the subject of such

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 14 of 50

repurchase agreement has been granted to the Trustee, and (iii) such obligations are free and clear of any adverse third-party claims;

(e)     Commercial paper rated in the highest rating category by S&P or Moody's, or upon the discontinuance of either rating service or both rating services, any other nationally recognized rating service acknowledged as being acceptable to the Issuer;

(f)     Investment agreements issued or guaranteed by any financial institution maintaining at least an "A" rating or its equivalent from S&P or Moody's, or their successors; and

(g)     Money market funds registered under the Investment Company Act of 1940, whose shares are registered under the Securities Act of 1933, as amended; which have a rating by S&P of AAAm-G, AAA-m, or AA-m, and if rated by Moody's Aaa, Aa1 or Aa2; and which are invested solely in obligations listed in paragraphs (a), (b) or (c) above, including any such fund as to which the Trustee or any of its affiliates provides services as an investment advisor or custodian.

The term "Environmental Regulations" means any federal, State or local law, statute, code, ordinance, regulation, requirement or rule relating to dangerous, toxic or hazardous pollutants, Hazardous Substances, chemical waste, material or substances.

The term "Event of Default" means any of the events specified in Section 7.01 of this Indenture.

The term "Expendable Resources" means Unrestricted Net Assets (as set forth in the most recent audited financial statements of the Borrower, as applicable) less net investment in plant plus temporarily restricted net assets, all as determined in accordance with GAAP.

The term "Financial Consultant" means an independent firm of financial or management consultants of favorable regional or national reputation for skill and experience in passing on questions relating to the financial condition, financial affairs, marketing, management and operations of the businesses of nonprofit entities of comparable size and nature to the Borrower.

The term "Fiscal Year" means the period beginning on September 1 of each year and ending on the next succeeding August 31 or any other twelve-month period hereafter selected and designated by the Borrower as the official fiscal year period of the Borrower.

The term "GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial

Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, that are applicable to the circumstances as of the date of determination.

The term "Government Obligations" means bills, certificates of indebtedness, notes, bonds or similar securities which are direct obligations of, or the principal and interest of which are unconditionally guaranteed by, the United States of America.

The term "Governmental Unit" shall have the meaning set forth in Section 150 of the Code.

The term "Gross Revenues" means: (i) all receipts, revenues, payments, income and other moneys received by or on behalf of the Borrower from any source (other than the Guaranty or Credit Facility), whether or not in connection with the ownership or the operation of all or any part of the Project and all other operating and nonoperating revenues, including, without limitation, any and all lease revenues for the use of the Project, and all rights to receive the same whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles of the Borrower and the proceeds thereof, the proceeds of any insurance coverage on and condemnation awards in respect of the Project or any gain on the sale or other disposition of property of the Borrower, to the extent applicable by law; all of the foregoing, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Borrower; and including all gifts, grants, bequests, donations and contributions, except those heretofore or hereafter made, designated at the time of making by the donor or maker as being for certain specified purposes inconsistent with the application thereof to the payments due from the Borrower under the Agreement and except any income derived therefrom to the extent required by such designation or restriction ("Excluded Revenues"); and (ii) all right, title and interest of the Borrower in and to the funds and accounts (excluding amounts held in the Rebate Fund) established under this Indenture and the Agreement.

The term "Guarantor" means Grace Community Church, Inc., d/b/a ChangePoint, an Alaska nonprofit corporation and GraceAlaska, an Alaska nonprofit corporation, jointly and severally.

The term "Guaranty" means the Guaranty Agreement by and among Grace Community Church, Inc., d/b/a ChangePoint, an Alaska nonprofit corporation, GraceAlaska, an Alaska nonprofit corporation, the Borrower and the Trustee, dated as of August 1, 2006.

The term "Hazardous Substances" means (a) any oil, flammable substance, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other wastes, materials or pollutants which (i) pose a hazard to the Project or to persons on or about the Project or (ii) cause the Project to be in violation of

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 16 of 50

any Environmental Regulation; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls, or radon gas; (c) any chemical, material or substance defined as or included in the definition of "waste," "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances" or words of similar import under any Environmental Regulation including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.; and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental Issuer or agency or may or could pose a hazard to the health and safety of the occupants of the Project or the owners and/or occupants of property adjacent to or surrounding the Project, or any other person coming upon the Project or adjacent property; or (e) any other chemical, materials or substance which may or could pose a hazard to the environment.

The term "Indebtedness" means:

      (a)     Long-Term Indebtedness, and

      (b)     Short-Term Indebtedness.

The term "Indenture" means this indenture, as originally executed or as it may from time to time be supplemented, modified or amended by any supplemental indenture entered into pursuant to the provisions hereof.

The term "Independent Architect" means a person who is a registered architect in the State, and who is not a full-time employee, director or shareholder of the Issuer, the Borrower or any Guarantor.

The term "Independent Engineer" means a person who is a registered structural engineer in the State, and who is not a full-time employee, director or shareholder of the Issuer, the Borrower or any Guarantor.

The term "Information Services" means the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs") and the State Information Depository ("SID"), if any, located in the State, or such other addresses and/or such other services providing information with respect to called Bonds as the Issuer may designate to the Trustee in writing.

The term "Initial Purchaser" means Dougherty & Company, LLC, a limited liability company organized and existing under the laws of Delaware.

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 17 of 50

The term "Interest Payment Date" means February 1 and August 1 of each year, commencing February 1, 2007.

The term "Issuance Date" means the date on which the Bonds are first delivered to the Initial Purchaser.

The term "Issuer" means the Alaska Industrial Development and Export Authority, a public corporation of the State and a body corporate and politic constituting a political subdivision within the Department of Commerce, Community, and Economic Development, but with separate and independent legal existence, duly organized and existing under the Act.

The term "Issuer's Tax Certificate" means the Tax Certificate executed by the Issuer dated the Issuance Date of the Bonds, as the same may be amended or supplemented in accordance with its terms, including the exhibits thereto.

The term "Land Lease" means the land lease made and entered into as of August 1, 2006, by and between Anchorage Community Development, LLC, an Alaska limited liability company, and the Borrower, for the acquisition of a 50 year leasehold interest on the real property located at Fragment Lot 4, Commercial Tract Fragment Lot Site for Tract A, Alaska Seafood International Subdivision, according to the official plat thereof, filed under Plat Number 99-18, records of the Anchorage Recording District, Third Judicial District, State of Alaska or, more generally referred to as, the corner of Raspberry Road and Minnesota Drive in Anchorage, Alaska.

The term "Loan Default Event" means any of the events of default specified in Section 17 of the Agreement.

The term "Long-Term Indebtedness" means indebtedness with a stated term greater than one year or with a term that may be extended beyond one year at the option of the Borrower.

The term "Maturity Date" means August 1 in each year set forth in Sections 2.02(c) and 4.01(c) hereof.

The term "Moody's" means Moody's Investors Service, a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Issuer.

The term "Net Available Cash Flow" means for any period the sum of the excess of revenues over expenses (before extraordinary items) of the Borrower for such period, determined in accordance with GAAP, to which shall be added interest, amortization and

depreciation expenses and other noncash charges, each item determined in accordance with GAAP.

The term "Nominee" means Cede & Co., as nominee of DTC, the initial Securities Depository for the Bonds, and any successor nominee of DTC and, if another Securities Depository replaces DTC as Securities Depository hereunder, any nominee of such substitute Securities Depository.

The term "Official Statement" means that certain Official Statement distributed with respect to the Bonds, dated as of August 15, 2006.

The term "Opinion of Bond Counsel" means an Opinion of Counsel by a nationally recognized bond counsel firm experienced in matters relating to the exclusion from gross income for federal income tax purposes of interest payable on obligations of state and political subdivisions.

The term "Opinion of Counsel" means a written opinion of counsel (which may be counsel for the Issuer) selected by the Issuer. If and to the extent required by the provisions of Section 1.02 of this Indenture, each Opinion of Counsel shall include the statements provided for in Section 1.02 of this Indenture.

The term "Optional Redemption Account" means the account by that name in the Bond Fund established pursuant to Section 5.02(a) hereof.

The term "Outstanding," when used as of any particular time with reference to Bonds, means (subject to the provisions of Section 11.09 hereof) all Bonds theretofore, or thereupon being, authenticated and delivered by the Trustee under this Indenture except (a) Bonds theretofore canceled by the Trustee or surrendered to the Trustee for cancellation; (b) Bonds with respect to which all liability of the Issuer shall have been discharged in accordance with Section 10.01 or Section 10.02 of this Indenture; and (c) Bonds for the transfer or exchange of which, or in lieu of or in substitution for which, other Bonds shall have been authenticated and delivered by the Trustee pursuant to this Indenture.

The term "Permitted Encumbrances" shall mean and include:

(a)     Undetermined liens and charges incident to construction or maintenance of the Project, and liens and charges incident to construction or maintenance now or hereafter filed of record which are being contested in good faith and have not proceeded to judgment, provided that the Borrower shall have set aside adequate reserves with respect thereto;

(b)     The lien of taxes and assessments which are not delinquent;

(c) Easements, exceptions, reservations or other agreements for the purpose of pipelines, conduits, cables, radio, television, telegraph, telephone and power lines, and substations, roads streets, alleys, highways, equestrian trails, walkways, drainage, irrigation, water, and sewage courses, dikes, canals, culverts, laterals, ditches, the removal of water or oil, gas, coal or other minerals, and other like purposes, or for the joint or common use of real property, facilities and equipment which in the aggregate do not materially impair the value or the use of such property for the purposes for which it is or may reasonably be expected to be held;

(d) Rights reserved to or vested in any municipality or governmental or other public authority to control or regulate or use in any manner any portion of the Project or Deed of Trust Property which do not materially impair the use of the Project and the Deed of Trust Property, for the purpose for which it is or may reasonably be expected to be held;

(e) Present or future valid zoning laws and ordinances or other valid laws and ordinances restricting the occupancy, use or enjoyment of real property;

(f) The lien created by the Prior Deed of Trust;

(g) The rights of the Issuer under the Loan Agreement;

(h) The lien created by the Deed of Trust; and

(i) Encumbrances of record existing on the date of this Indenture, and listed on Schedule B of the Title Policy.

The term "Person" means an individual corporation, firm, association, unincorporated organization, limited liability company, joint venture, partnership, trust, or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

The term "Plans and Specifications" means the plans and specifications for the construction of the Project produced by the Anchorage-based architectural firm ASCG, Inc.

The term "Principal Corporate Trust Office" means the corporate trust office of the Trustee, which at the date of execution of this Indenture is that specified in Section 11.07 of this Indenture; provided, however, that with respect to the payment, registration and transfer of Bonds, the term "Principal Corporate Trust Office" shall mean the corporate trust office of the Trustee in Minneapolis, Minnesota.

The term "Principal Payment Date" means with respect to any Bond, the date on which the principal thereof becomes due and payable hereunder, whether at maturity or

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
J:\Docs\37300724\Trust Indenture Final.wpd

Page 15

upon redemption (other than mandatory sinking fund payments) or acceleration.

The term "Prior Deed of Trust" means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 9, 2005, and filed in the Anchorage Recording District, Third Judicial District, State of Alaska.

The term "Project" means, collectively, the acquisition of a 50 year leasehold interest on the real property located at Fragment Lot 4, Commercial Tract Fragment Lot Site for Tract A, Alaska Seafood International Subdivision, according to the official plat thereof, filed under Plat Number 99-18, records of the Anchorage Recording District, Third Judicial District, State of Alaska or, more generally referred to as, the corner of Raspberry Road and Minnesota Drive in Anchorage, Alaska, and the acquisition, development, construction, and equipping of an approximately 177,000 square foot multi-use sports facility with an inflatable dome located thereon.

The term "Project Fund" means the fund by that name established pursuant to Section 3.04 of this Indenture.

The term "Promissory Note" means the Promissory Note entered into by the Borrower dated as of August 1, 2006 in the form attached as Exhibit A to the Agreement.

The term "Rating Agency" means at any time any rating agency, including Moody's or S&P, then rating the Bonds at the request, and with the continued permission, of the Borrower.

The term "Rebate Fund" means the fund by that name established pursuant to Section 5.04 of this Indenture.

The term "Record Date" means, with respect to any Interest Payment Date for the Bonds, the 15th day of the calendar month immediately preceding such Interest Payment Date, whether or not such day is a Business Day.

The term "Replacement Reserve Deposit" means $0 prior to September 1, 2007, $87,500 for the year September 1, 2007 to August 31, 2008 and $175,000 per year thereafter (increased annually by the percentage increase in the Consumer Price Index) provided, however, no deposit by the Borrower shall be required if the balance on deposit in the Replacement Reserve Fund is at least equal to $1,500,000.

The term "Replacement Reserve Fund" means the fund by that name established pursuant to Section 5.03 of this Indenture.

The term "Reserve Fund" means the fund by that name established pursuant to Section 5.05 of this Indenture.

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 16

The term "Reserve Requirement" means the least of (i) maximum Annual Debt Service on the Series 2006A Bonds (excluding amounts payable from the Reserve Fund on the final maturity date of the Series A Bonds), (ii) 125% of average Annual Debt Service on the Series 2006A Bonds, or (iii) 10% of the face amount of the Series 2006A Bonds.

The term "Responsible Officer" of the Trustee means and includes every vice president, every assistant vice president, every trust officer and every officer and assistant officer of the Trustee, other than those specifically above mentioned, with regular responsibility for the administration of matters related to this Indenture.

The term "Revenue Account" means the account by that name established pursuant to Section 5.02(a) of this Indenture.

The term "Revenues" means all payments received by the Issuer or the Trustee pursuant to or with respect to (a) the Agreement (except Additional Payments paid by the Borrower to the Issuer pursuant to Section 6 of the Agreement, any amounts paid by the Borrower pursuant to Section 19 of the Agreement and amounts received for or on deposit in the Rebate Fund), including, without limiting the generality of the foregoing, Base Loan Payments (including both timely and delinquent payments) and prepayments thereof, and all income derived from the investment of any money in any fund or account established pursuant to this Indenture (other than the Rebate Fund), (b) the net proceeds of any insurance claim or condemnation award received by the Trustee or the Issuer pursuant to the Agreement and the Deed of Trust, and (c) proceeds derived from the exercise of any remedies provided for under the Deed of Trust.

The term "S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Issuer.

The term "Securities Depository" means The Depository Trust Company, 55 Water Street, New York, New York 10041, Fax (212) 855-7320; or to such other addresses and/or such other securities depositories as the Issuer may designate to the Trustee in writing.

The term "Series" means whenever used with respect to the Bonds, all of the Bonds designated as being of the same series, executed and delivered in a simultaneous transaction, regardless of variation on maturity, interest rates, prepayment and other provisions, and any Bonds thereafter authenticated and delivered upon transfer or exchange or in lieu of or in substitution for (but not to redeem) such Bonds as provided in this Indenture.

The term "Series 2006A Bonds" means the Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Tax-

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 22 of 50

Exempt Series 2006A issued hereunder.

The term "Series 2006B Bonds" means the Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Taxable Series 2006B issued hereunder.

The term "Short-Term Indebtedness" means all indebtedness of the Borrower having an original maturity less than or equal to one year and not renewable at the option of the Borrower for a term greater than one year from the date of original incurrence or issuance.

The term "State" means the State of Alaska.

The term "Statement of an Accountant" means a written statement of a firm of independent certified public accountants signed by an authorized representative of such firm.

The term "Supplemental Indenture" or "indenture supplemental hereto" means any indenture supplemental to this Indenture hereafter duly authorized and entered into between the Issuer and the Trustee in accordance with the provisions of this Indenture.

The term "Tax-Exempt" means, with respect to interest on any obligations of a state or local government, including the Series 2006A Bonds, that such interest is excluded from gross income for federal income tax purposes whether or not such interest is includable as an item of tax preference or otherwise includable directly or indirectly for purposes of calculating tax liabilities, including any alternative minimum tax or environmental tax, under the Code.

The term "Title" means Fidelity Title Agency of Alaska, LLC.

The term "Title Policy" means the policy of title issued by the Title and relating to the Project.

The term "Trustee" means Wells Fargo Bank, National Association, a national banking association organized and existing under and by virtue of the laws of the United States of America, having a corporate trust office in Portland, Oregon, or its successor as Trustee hereunder as provided in Section 8.01 or 8.02 of this Indenture.

The term "Unrestricted Net Assets" means the unrestricted net assets of the relevant entity as reported in an audited statement of financial position, less Long-Term Indebtedness (net of amounts held in any reserve fund with respect to such debt and any gifts, grants, bequest, donations and contributions classified as restricted assets which have been both received by the relevant entity and pledged solely to the repayment of Long-Term Indebtedness).

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 18

The term "Valuation Date" means August 1 of each year (commencing August 1, 2007) or the next immediately preceding Business Day if such August 1 is not a Business Day.

SECTION 1.02. Content of Certificates and Opinions. Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include (a) a statement that the person or persons making or giving such certificate or opinion have read such condition or covenant and the definitions herein relating thereto; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of the signers, they have made or caused to be made such examination or investigation as is necessary to enable them to express an informed opinion as to whether or not such condition or covenant has been complied with; and (d) a statement as to whether, in the opinion of the signers, such condition or covenant has been complied with.

Any such certificate or opinion made or given by a member or officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous. Any such certificate or opinion made or given by counsel may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Issuer) upon the certificate or opinion of or representations by an officer of the Issuer, unless such counsel knows that the certificate or opinion or representations with respect to the matters upon which his or her opinion may be based as aforesaid are erroneous or in the exercise of reasonable care should have known that the same were erroneous.

Any written representation of the Issuer or determination of the Trustee given in accordance with Section 6.08 (regarding the amendment of the Agreement) or Article IX (regarding amendment of the Indenture) may, at the option of such party, be based solely on the written representation of a financial consultant or advisor selected by such party and not objected to by the other such party.

SECTION 1.03. Article and Section Headings and References. The headings or titles of the several Articles and Sections hereof, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of this Indenture.

All references herein to "Articles," "Sections" and other subdivisions are to the corresponding Articles, Sections or subdivisions of this Indenture; the words "herein," "hereof," "hereby," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof, and words of the

masculine gender shall mean and include words of the feminine and neuter genders.

SECTION 1.04. Construction. The parties hereto acknowledge that each such party and its respective counsel have participated in the drafting and revision of this Indenture. Accordingly, the parties agree that any rule of construction which disfavors the drafting party shall not apply in the interpretation of this Indenture or any amendment or supplement or exhibit hereto.

ARTICLE II
THE BONDS

SECTION 2.01. Authorization of Bonds. The Series 2006A Bonds are designated as the "Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Tax-Exempt Series 2006A." The Series 2006B Bonds are designated as the "Alaska Industrial Development and Export Authority, Sports Facilities Revenue Bonds (Anchorage Sportsplex Project) Taxable Series 2006B." The aggregate principal amount of Series 2006A Bonds issued under this Indenture shall be Eleven Million Five Thousand Dollars ($11,005,000) and, the aggregate principal amount of Series 2006B Bonds issued under this Indenture shall be Five Hundred Five Thousand Dollars ($505,000). This Indenture constitutes a continuing agreement with the Trustee and the Holders of all of the Bonds Outstanding, subject to the covenants, agreements, provisions and conditions herein contained to secure the full and final payment of the principal of, premium, if any, and interest on all Bonds.

SECTION 2.02. Terms of Bonds.

(a)     The Bonds shall be issued as fully registered Book-Entry Bonds in Authorized Denominations. The Bonds shall initially be registered in the name of the Cede & Co., as nominee of DTC. The Bonds of each Series shall be secured on a parity basis.

(b)     The Bonds shall be dated the Dated Date. Each Bond shall bear interest from the Interest Payment Date next preceding the date of the authentication thereof or, if it is authenticated after a Record Date and on or before the related Interest Payment Date, it will bear interest from such Interest Payment Date or if authenticated on or before the Record Date for the first Interest Payment Date, from the Dated Date, provided, however, that if, at the time of authentication of such Bond, interest is in default on Outstanding Bonds, such Bond shall bear interest from the Interest Payment Date to which interest has previously been paid or made available for payment on the Outstanding Bonds, or, if no interest has been paid or made available for payment thereon, from the Dated Date of such Bonds. Interest on the Bonds shall be calculated on the basis of a 360-day year of twelve 30-day months and shall be payable in arrears on each Interest Payment Date, upon maturity or upon prior redemption.

(c)     The Bonds of each Series shall be substantially in the respective forms set

forth in Exhibit A and Exhibit B hereto, shall bear interest at the annual rates (computed upon the basis of a 360-day year, consisting of twelve 30-day months) set forth below, payable on each Interest Payment Date, commencing February 1, 2007, and shall mature, subject to prior redemption or acceleration, on August 1 in the years shown below.

**Series 2006A Bonds**

| Maturity Date (August 1) | Amount | Interest Rate |
|---|---|---|
| 2021 | $3,720,000 | 6.00% |
| 2031 | 7,285,000 | 6.15 |

**Series 2006B Bonds**

| Maturity Date (August 1) | Amount | Interest Rate |
|---|---|---|
| 2011 | $505,000 | 6.50% |

(d)     [Intentionally Omitted]

(e)     The Bonds of each Series shall be numbered, respectively, in consecutive numerical order from R-1 upwards. Registered ownership of the Bonds, or any portion thereof, may not thereafter be transferred except as set forth in Sections 2.04 and 2.08 hereof.

(f)     The principal of and premium, if any, on the Bonds shall be payable in lawful money of the United States of America upon surrender at the Principal Corporate Trust Office of the Trustee. The interest on any Bond shall be payable to the person whose name appears on the registration books of the Trustee as the Registered Owner thereof as of the close of business on the Record Date for each Interest Payment Date, such interest to be paid by check mailed by first class mail, postage prepaid, on such Interest Payment Date, to the Registered Owner at his or her address as it appears on such registration books. Notwithstanding the foregoing, however, any Holder of $1,000,000 or more in an aggregate principal amount of the Bonds shall be entitled to receive payments of interest on the Bonds held by it by wire transfer of immediately available funds to such bank or trust company located within the United States of America as such other Holder shall designate in writing to the Trustee by the Record Date for such payment. Any such designation shall remain in effect until rescinded in writing by such Holder.

SECTION 2.03. Execution of Bonds. The Bonds shall be signed in the name and on behalf of the Issuer with the manual or facsimile signature of its Executive Director, and attested by the manual or facsimile signature of an Assistant Secretary. The Bonds shall then be delivered to the Trustee for registration and authentication by it. In case any of the officers who shall have signed or attested any of the Bonds shall cease to be such officer

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 26 of 50

or officers before the Bonds so signed or attested shall have been authenticated or delivered by the Trustee or issued by the Issuer, such Bonds may nevertheless be authenticated, delivered and issued and, upon such authentication, delivery and issue, shall be as binding upon the Issuer as though those who signed and attested the same had continued to be such officers of the Issuer. Also any Bond may be signed and attested on behalf of the Issuer by such persons as on the actual date of the execution of such Bond shall be the proper officers although on the nominal date of such Bond any such person shall not have been such officer.

Only such of the Bonds as shall bear thereon a certificate of authentication and registration in substantially the forms set forth in Exhibits A and B hereto, manually executed by the Trustee, shall be valid or obligatory for any purpose or entitled to the benefits of this Indenture, and such certificate of the Trustee shall be conclusive evidence that the Bonds so authenticated have been duly authenticated and delivered hereunder and are entitled to the benefits of this Indenture.

SECTION 2.04. Transfer and Exchange of Bonds.

(a)      Registration of any Bond may, in accordance with the terms of this Indenture, be transferred, upon the Bond Register required to be kept pursuant to the provisions of Section 2.06, by the Person in whose name it is registered, in person or by his duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by a written instrument of transfer in a form approved by the Trustee, duly executed. Whenever any Bond shall be surrendered for registration of transfer, the Issuer shall prepare and execute and the Trustee shall authenticate and deliver a new Bond or Bonds of the same principal amounts, interest rates, maturity and Series. The Trustee shall require the payment by the Bondholder requesting such transfer of any tax or other governmental charge required to be paid with respect to such transfer, and there shall be no other charge to any Bondholders for any such transfer. No registration of transfer of Bonds upon the Bond Register shall be required to be made during the period after any Record Date and prior to the related Interest Payment Date or during the period of fifteen (15) days next preceding the date on which the Trustee gives any notice of redemption, nor shall any registration of transfer of Bonds called for redemption be required.

(b)      Bonds may be exchanged at the Principal Corporate Trust Office of the Trustee for a like aggregate principal amount of Bonds of the same interest rate, maturity, Series and in Authorized Denominations. Whenever any Bond shall be surrendered for exchange, the Issuer shall prepare and execute and the Trustee shall authenticate and deliver new Bonds of the same principal amount, interest rate, maturity and Series. The Trustee shall require the payment by the Bondholder requesting such exchange of any tax or other governmental charge required to be paid with respect to such exchange, and there shall be no other charge to any Bondholders for any such exchange. No exchange of Bonds shall be required to be made during the period after any Record Date and prior to the related Interest Payment Date or during the period of fifteen (15) days next preceding

the date on which the Trustee gives notice of redemption, nor shall any exchange of Bonds called for redemption be required.

(c)     The Bonds may not be transferred to any person that is not a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933, as amended, or an "accredited investor" within the meaning of Rule 501 of Regulation D of the rules governing the limited offering and sale of securities without registration under such Act.

SECTION 2.05. Book-Entry System.

(a) The Bonds shall initially be issued in the form of one separate single certificated fully registered bond for each maturity of the Bonds, registered in the name of Cede & Co., as nominee of DTC, the initial Securities Depository for the Bonds. Except as provided in subsection (e) below, all of the Outstanding Bonds shall be so registered on the Bond Register, and the provisions of subsection (f) of this Section shall apply thereto.

(b)     The Issuer, the Borrower and the Trustee shall have no responsibility or obligation to any DTC Participant or to any Beneficial Owner except as otherwise expressly provided herein. Without limiting the immediately preceding sentence, the Issuer, the Borrower and the Trustee shall have no responsibility or obligation with respect to (1) the accuracy of the records of DTC or any other Securities Depository for the Bonds any Nominee or any Participant with respect to any ownership interest in the Bonds, (2) the delivery to any Participant or any other person other than a Bondholder as shown on the Bond Register of any notice with respect to the Bonds (excepting the Borrower s obligation to deliver certain notices to Beneficial Owners as required under the Loan Agreement) including any notice of redemption, or (3) the payment to any Participant or any other Person other than a Bondholder as shown on the Bond Register of any amount with respect to principal of, premium, if any, or interest on the Bonds. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondholders, as shown on the Bond Register or their respective attorneys duly authorized in writing and all such payments shall be valid and effective to fully satisfy and discharge the Issuer's obligations with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. The Issuer, the Borrower and the Trustee may treat and consider the Person in whose name each Bond is registered on the Bond Register as the Holder and absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on, such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever.

(c)     No person other than a Bondholder, as shown on the Bond Register, shall receive a certificated Bond evidencing the obligation of the Issuer to make payments of principal of, or premium, if any, or interest on, the Bonds pursuant to this Indenture.

(d)     The Issuer and the Trustee shall, if not previously on file, execute and deliver to DTC and each substitute Securities Depository a letter of representation in customary form with respect to the Bonds (the "Representation Letter"), but such Representation Letter shall not in any way limit the provisions of Section 2.05(b) hereof or in any other way impose upon the Issuer or the Trustee any obligation whatsoever with respect to Persons having interests in the Bonds other than the Bondholders, as shown on the Bond Register. The Trustee shall take all action necessary for all representations of such party in the Representation Letter with respect to the Trustee to be complied with at all times.

(e)     The Borrower, with the consent of the Issuer, may terminate the services of the Securities Depository then acting as securities depository for the Bonds. The Securities Depository then acting as securities depository for the Bonds may determine to discontinue providing its services with respect to the Bonds at any time by giving written notice and all known information on the Participants and the Beneficial Owners having an interest in the Bonds to the Issuer, the Borrower and the Trustee and discharging its responsibilities with respect thereto under applicable law. Upon the discontinuance or termination of the services of DTC with respect to the Bonds, unless a substitute securities depository is appointed by the Borrower (with the consent, or at the request, of the Issuer) to undertake the functions of Securities Depository hereunder, the Issuer, at the expense of the Borrower, is obligated to deliver Bond certificates to or upon the order of the Beneficial Owners of such Bonds, as described in this Indenture, and such Bonds shall no longer be restricted to being registered on the Bond Register in the name of the Securities Depository or its Nominee, but may be registered in whatever name or names Bondholders transferring or exchanging such Bonds shall designate, in accordance with the provisions of this Indenture. If a substitute Securities Depository is appointed for the Bonds in accordance with this subsection (e) the Bonds shall be registered in the Bond Register in the name of such substitute Securities Depository or its Nominee.

(f)     So long as any Bond is registered in the name of a Securities Depository or its Nominee, all payments with respect to principal of, premium, if any, and interest on such Bond and all notices with respect to such Bond shall be made and given, respectively, in the manner provided in the Representation Letter. Bondholders shall have no lien or security interest in any rebate or refund paid by a Securities Depository to the Trustee which arises from the payment by the Trustee of principal of, premium, if any, or interest on the Bonds in immediately available funds to such Securities Depository or its Nominee.

SECTION 2.06. Bond Register. The Trustee will keep or cause to be kept, at its Principal Corporate Trust Office, books for the registration of transfer of the Bonds, which shall at all reasonable times during normal business hours upon reasonable notice be open to inspection by the Borrower or the Issuer; and, upon presentation for such purpose, the Trustee shall, under such reasonable regulations as it may prescribe, register the transfer or cause to be registered the transfer, on said books, of Bonds as hereinbefore provided.

SECTION 2.07. [Intentionally Omitted]

SECTION 2.08. Bonds Mutilated, Lost, Destroyed or Stolen. If any Bond shall become mutilated, the Issuer, at the expense of the Holder of said Bond, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like principal amount, interest rate, Series and maturity in exchange and substitution for the Bond so mutilated, but only upon surrender to the Trustee of the Bond so mutilated. Every mutilated Bond so surrendered to the Trustee shall be canceled by it and delivered to, or upon the order of, the Issuer. If any Bond issued hereunder shall be lost, destroyed or stolen, evidence of such loss, destruction or theft may be submitted to the Trustee and, if such evidence be satisfactory to it and indemnity satisfactory to it shall be given, the Issuer, at the expense of the Holder, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like principal amount, interest rate, Series, and maturity in lieu of and in substitution for the Bond so lost, destroyed or stolen. If any Bond mutilated, lost, destroyed or stolen shall have matured or shall have been called for redemption, instead of issuing a substitute Bond the Trustee may pay the same without surrender upon receipt of indemnity satisfactory to the Trustee. The Issuer may require payment from the Holder of a sum not exceeding the actual cost of preparing each new Bond issued under this Section and of the expenses which may be incurred by the Issuer and the Trustee. Any Bond issued under the provisions of this Section in lieu of any Bond alleged to be lost, destroyed or stolen shall constitute an original additional contractual obligation on the part of the Issuer and shall be entitled to the benefits of this Indenture with all other Bonds secured by this Indenture.

SECTION 2.09. Disposition of Cancelled Bonds. When and as paid in full, each Bond shall be delivered to the Trustee, who shall forthwith cancel such Bond. The Trustee may destroy or retain such cancelled Bonds.

ARTICLE III
ISSUANCE OF BONDS; APPLICATION OF PROCEEDS;
ESTABLISHMENT OF COSTS OF ISSUANCE FUND;
ESTABLISHMENT AND APPLICATION OF PROJECT FUNDS

SECTION 3.01. Authentication and Delivery of Bonds. The Bonds shall be authenticated and delivered by the Trustee in the aggregate principal amount set forth in Section 2.01 of this Indenture and shall be $11,005,000 with respect to the Series 2006A Bonds, and shall be $505,000 with respect to the Series 2006B Bonds.

SECTION 3.02. Application of Proceeds of Bonds. The proceeds received by the Issuer from the sale of the Bonds, being the sum of $11,144,335.52 (representing the proceeds from the sale of the Series 2006A Bonds of $10,836,598.43, being the amount consisting of the aggregate principal amount of the Series 2006A Bonds of $11,005,000, less an underwriter's discount of $196,369.38, plus accrued interest of $27,967.81, and the proceeds from the sale of the Series 2006B Bonds of $307,737.09, being the amount consisting of the aggregate principal amount of the Series 2006B Bonds of $505,000, less an underwriter's discount of $198,630.62, plus accrued interest of $1,367.71), shall be

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 25

deposited with the Trustee, which shall forthwith set aside or transfer such proceeds as set forth below.

    (a)    [Intentionally Omitted]

    (b)    The Trustee shall deposit $306,369.38 of Bond proceeds in the Costs of Issuance Fund (all of which are attributable to proceeds from the Series 2006B Bonds).

    (c)    The Trustee shall deposit $9,380,999.26 of Series 2006A Bond proceeds to the Project Fund.

    (d)    The Trustee shall deposit $928,927.50 of Series 2006A Bond proceeds into the Reserve Fund.

    (e)    The Trustee shall deposit $528,039.38 of Bond proceeds in the Bond Account, which amount represents accrued interest from the Dated Date to the Issuance Date on the Bonds and nine month's capitalized interest on the Bonds (consisting of $27,967.81 of accrued interest on the Series 2006A Bonds, $1,367.71 of accrued interest on the Series 2006B Bond, and $498,703.86 of Series 2006A Bond proceeds).

The Trustee may, in its discretion, establish one or more temporary funds or accounts in its books and records to facilitate such deposits or transfers.

SECTION 3.03. <u>Establishment and Application of Costs of Issuance Fund</u>. The Trustee shall establish, maintain and hold in trust a separate fund designated as the Costs of Issuance Fund. Moneys deposited in said fund shall be used to pay Costs of Issuance with respect to the Bonds upon a Requisition of the Borrower filed with the Trustee which shall be in substantially the form attached hereto as Exhibit C. At the end of six months from the date of issuance of the Bonds or upon earlier receipt of a Statement of the Borrower stating that amounts in such fund are no longer required for the payment of Costs of Issuance, such fund shall be terminated and any amounts then remaining in such fund shall be transferred to the Project Fund.

SECTION 3.04. <u>Establishment and Application of Project Fund</u>.

    (a)    The Trustee shall establish, maintain and hold in trust a separate fund designated as the "Project Fund." Moneys deposited in the Project Fund shall be applied to pay costs of the Project pursuant to the terms of the Disbursing Agreement.

    (b)    Money in the Project Fund shall be disbursed by the Trustee to pay for, or reimburse the Borrower for its payment of, Project Costs upon receipt by the Trustee of a Borrower request substantially in the form of Exhibit A to the Disbursing Agreement, requesting the payment or reimbursement, dated not more than thirty (30) days before the date of the receipt thereof by the Trustee, and upon compliance with the Disbursing

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 31 of 50

Agreement.

For purposes of complying with the requirements of this Section 3.04, the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon the Borrower request, which may be submitted in fax form, and shall not be bound to make any investigation into the facts or matters stated in such Borrower request. The Trustee shall not be responsible for determining whether the funds on hand in the Project Fund are sufficient to complete the Project. The Trustee shall not be responsible to collect lien waivers.

(c)     When the Project shall have been completed, a Written Certificate of the Borrower certifying the fact and date of such completion and certifying that all of the costs thereof have been determined and paid (or that all such costs have been paid less specified claims which are subject to dispute and for which a retention in the Project Fund is to be maintained in the full amount of such claims until such dispute is resolved) shall be delivered to the Trustee by the Borrower. Upon receipt of such Certificate, the Trustee shall, as directed by such Certificate, transfer any remaining balance in the Project Fund to the Bond Fund. Upon such transfer, the Project Fund shall be closed.

(d)     Notwithstanding anything to the contrary contained herein, if the Written Certificate of the Borrower certifying completion of the Project (as described in subsection (c) of this Section 3.04) shall not have been delivered to the Trustee within 24 months of the Issuance Date, the Trustee shall automatically and without further action or consent on the part of the Borrower, transfer the balance of the Project Fund (net of amounts maintained for the payment of disputed claims which shall be held in trust pending the resolution of such disputes and with any amounts remaining after the resolution of such disputes being promptly transferred to the Bond Fund) to the Bond Fund, and upon such transfer, the Project Fund shall be closed.

## ARTICLE IV
## REDEMPTION

SECTION 4.01. Terms of Redemption. The Bonds shall be subject to redemption as follows:

(a)     Optional Redemption.

(i)     The Series 2006A Bonds are subject to optional redemption prior to their stated maturity, as a whole or in part, on any date on or after August 1, 2015, from any moneys received by the Trustee from the Borrower, provided in each case that the amount of Series 2006A Bonds to be redeemed from the amount so prepaid and the date fixed for redemption shall be as specified in the Request of the Borrower given pursuant to Section 8(a) or (b) of the Agreement, at the following redemption prices (expressed as a percentage of the principal amount to be redeemed) plus accrued interest,

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 32 of 50

if any, to the date fixed for redemption:

| Redemption Periods | Redemption Price |
|---|---|
| August 1, 2015 to the last calendar day of July, 2016 | 102% |
| August 1, 2016 to the last calendar day of July, 2017 | 101 |
| August 1, 2017 and any date thereafter | 100 |

(ii)     The Series 2006B Bonds are not subject to optional redemption.

(b)     Extraordinary Redemption from Insurance or Condemnation Proceeds. The Bonds are subject to redemption prior to their respective stated maturities in whole or in part, on the date fixed for redemption specified in the related notice of redemption, which date shall be the first practicable date for which the applicable notice can be given, from insurance or condemnation proceeds received by the Trustee from the Borrower pursuant to Section 12(c) of the Agreement and deposited in the Optional Redemption Account, at a redemption price equal to 100% of the principal amount of the Bonds being redeemed plus accrued interest to the date fixed for redemption (without premium).

(c)     Mandatory Redemption from Sinking Fund Payments. (i) The Series 2006A Bonds are subject to redemption, in part, by lot, from mandatory sinking fund payments deposited in the Bond Fund on each August 1, from and after August 1, 2011, at the principal amount thereof plus accrued interest, if any, to the date of redemption (without premium).

(ii)     On each Maturity Date for the Series 2006A Bonds, the Trustee shall apply moneys in the Bond Fund to the redemption of the Series 2006A Bonds in the principal amounts and on the mandatory sinking fund payment dates hereinafter set forth:

| Mandatory Sinking Fund Payment Dates (August 1) | Mandatory Sinking Fund Payment |
|---|---|
| 2011 | $200,000 |
| 2012 | 265,000 |
| 2013 | 285,000 |
| 2014 | 300,000 |
| 2015 | 320,000 |
| 2016 | 335,000 |
| 2017 | 360,000 |
| 2018 | 380,000 |
| 2019 | 400,000 |
| 2020 | 425,000 |
| 2021* | 450,000 |

* Payment at maturity.

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 28

| Mandatory Sinking Fund Payment Dates (August 1) | Mandatory Sinking Fund Payment |
|---|---|
| 2022 | $480,000 |
| 2023 | 510,000 |
| 2024 | 540,000 |
| 2025 | 570,000 |
| 2026 | 610,000 |
| 2027 | 645,000 |
| 2028 | 685,000 |
| 2029 | 725,000 |
| 2030 | 770,000 |
| 2031* | 1,750,000 |

---

* Payment at maturity.

(iii) The Series 2006B Bonds are subject to redemption, in part, by lot, from mandatory sinking fund payments deposited in the Bond Fund on each August 1, from and after August 1, 2009, at the principal amount thereof plus accrued interest, if any, to the date of redemption (without premium).

(iv) On each Maturity Date for the Series 2006B Bonds, the Trustee shall apply moneys in the Bond Fund to the redemption of the Series 2006B Bonds in the principal amounts and on the mandatory sinking fund payment dates hereinafter set forth:

| Mandatory Sinking Fund Payment Dates (August 1) | Mandatory Sinking Fund Payment |
|---|---|
| 2009 | $220,000 |
| 2010 | 235,000 |
| 2011* | 50,000 |

---

* Payment at maturity.

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 29

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 34 of 50

(d)     Mandatory Redemption Upon Determination of Taxability. In the event of a prepayment pursuant to Section 8(c) of the Agreement as a result of a Determination of Taxability, the Bonds of each Series Outstanding on the date of the occurrence of the Determination of Taxability shall be redeemed in whole at any time within 60 days thereafter, at the redemption price set forth below of the principal amount thereof plus accrued interest to the date of redemption.

| Outstanding Bonds | Redemption Price |
|---|---|
| Series 2006A Bonds | 103% |
| Series 2006B Bonds | 100 |

SECTION 4.02. Selection of Bonds for Redemption. Except for Bonds redeemed pursuant to Section 4.01(c) hereof, whenever provision is made in this Indenture for the redemption of less than all of the Bonds, the Trustee shall select the Bonds, or portions of the Bonds, to be redeemed, from the Outstanding Bonds not previously called for redemption, by lot within a maturity and, if more than one maturity, in inverse order of maturity within a Series or in the case of a redemption effected pursuant to Section 4.01(a) hereof such other order of maturity as shall be specified in the related Request of the Borrower.

SECTION 4.03. Notice of Redemption. Notice of redemption shall be given by the Trustee as hereinafter provided to (i) the respective Holders of any Bonds designated for redemption at their addresses appearing on the Bond registration books of the Trustee, (ii) the Information Services, (iii) the Securities Depositories and (iv) the Issuer. Each notice of redemption shall state the date of such notice, the date fixed for redemption, the redemption price (including any premium), the place or places of redemption (including the name and appropriate address or addresses of the Trustee), the Series of such Bonds called for redemption, the CUSIP number (if any) of the maturity or maturities, and, if less than all the Bonds of any maturity are to be redeemed, the distinctive certificate numbers, of the Bonds of such maturity to be redeemed and, in the case of Bonds to be redeemed in part only, the respective portions of the principal amount thereof to be redeemed. Each such notice shall also state that on said date there will become due and payable on each of said Bonds the redemption price thereof or of said specified portion of the principal amount thereof in the case of a Bond to be redeemed in part only, together with interest accrued thereon to the date fixed for redemption, and that from and after such date fixed for redemption interest thereon shall cease to accrue, and shall require that such Bonds be then surrendered at the address or addresses of the Trustee specified in the redemption notice. In the case of an optional redemption under Section 4.01(a), the notice may state (1) that such optional redemption is conditioned upon the deposit of moneys, in an amount equal to the amount necessary to effect the redemption contemplated in the notice, with the Trustee no later than the date fixed for redemption or (2) that the Borrower retains the right to rescind such notice on or prior to the date fixed for redemption (in either case, a "Conditional Redemption"), and such notice and optional redemption shall be of no effect if such moneys are not so deposited or if the notice is rescinded as described below.

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 35 of 50

Any notice of redemption shall be mailed by first class mail, postage prepaid, to Bondholders not less than thirty (30) days or more than sixty (60) days prior to the date fixed for redemption. If the redemption is a Conditional Redemption the notice shall so state. Notices to the Information Services shall be mailed by the Trustee by first class mail, postage prepaid, or by such other method acceptable to such institutions at the time of the mailing of notices to Bondholders. Notices to the Securities Depositories shall be given by telecopy or by certified registered or overnight mail at least one (1) Business Day before the mailing of notices to Bondholders.

Notice of redemption of Bonds shall be given by the Trustee, at the expense of the Borrower, for and on behalf of the Issuer. Any Conditional Redemption may be rescinded in whole or in part at any time on or prior to the related date fixed for redemption if the Borrower delivers a Certificate to the Trustee instructing the Trustee to rescind the redemption notice. The Trustee shall give prompt notice of such rescission to the affected Bondholders. Any Bonds subject to Conditional Redemption where redemption has been rescinded shall remain Outstanding, and the related rescission shall not constitute an Event of Default. Further, in the case of a Conditional Redemption, the failure of the Borrower to make funds available in part or in whole on or prior to the date fixed for redemption shall not constitute an Event of Default, and the Trustee shall give prompt notice to the Securities Depository and the affected Bondholders that the redemption did not occur and that the Bonds called for redemption and not so redeemed remain Outstanding.

Failure by the Trustee to give notice pursuant to this Section 4.03, or the insufficiency of any such notice, shall not affect the sufficiency of the proceedings for redemption of any Bond for which notice was properly given.

SECTION 4.04. Partial Redemption of Bonds. Upon surrender of any Bond redeemed in part only, the Issuer shall execute and the Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Borrower, a new Bond or Bonds of Authorized Denominations equal in aggregate principal amount to the unredeemed portion of the Bond surrendered and of the same interest rate, Series and maturity.

SECTION 4.05. Effect of Redemption. Moneys for payment of the redemption price of, together with interest accrued to the date fixed for redemption on, the Bonds (or portions thereof) so called for redemption being held by the Trustee, on the date fixed for redemption designated in the notice required by Section 4.03 of this Indenture, the Bonds (or portions thereof) so called for redemption shall become due and payable at the redemption price specified in such notice and interest accrued thereon to the date fixed for redemption, interest on the Bonds so called for redemption shall cease to accrue from and after the date fixed for redemption, said Bonds (or portions thereof) shall cease to be entitled to any benefit or security under this Indenture, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of said redemption price and accrued interest to the date fixed for redemption.

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 31

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 36 of 50

All Bonds redeemed pursuant to the provisions of this Article shall be canceled upon surrender thereof.

## ARTICLE V
## PLEDGE AND ASSIGNMENT; ESTABLISHMENT OF FUNDS AND ACCOUNTS

SECTION 5.01. Pledge and Assignment.

(a)     Subject only to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, there are hereby pledged to secure the payment of the principal of and premium, if any, and interest on the Bonds, in accordance with their terms and the provisions of this Indenture, all of the Revenues and any other amounts (including proceeds of the sale of Bonds but excluding Additional Payments paid by the Borrower pursuant to Section 6 of the Agreement and any amounts paid by the Borrower pursuant to Section 19 of the Agreement) held in any fund or account established pursuant to this Indenture (other than the Rebate Fund).

(b)     The Issuer hereby assigns to the Trustee, for the benefit of the Holders from time to time of the Bonds, all of the Revenues and other amounts pledged in paragraph (a) of this Section and all of the right, title and interest of the Issuer in the Agreement (except for the right to receive any administrative fees and expenses payable to the Issuer, the right to receive any indemnification, the right to receive any notices and reports and the right to enforce the covenant of the Borrower made in Section 11 of the Agreement). The Trustee shall be entitled to and shall receive all of the Revenues, and any Revenues collected or received by the Borrower shall be deemed to be held, and to have been collected or received, by the Issuer as the agent of the Trustee and shall forthwith be paid by the Issuer to the Trustee. The Trustee also shall be entitled to and shall (subject to the provisions of this Indenture) take all steps, actions and proceedings, whether prior to or following the occurrence of any Event of Default reasonably necessary in its judgment to enforce, either jointly with the Issuer or separately, all of the rights of the Issuer assigned to the Trustee and all of the obligations of the Borrower under the Agreement and the Deed of Trust.

(c)     All Revenues shall be held in trust for the benefit of the Holders from time to time of the Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes hereinafter in this Article V set forth.

(d)     [RESERVED]

(e)     The Bonds and the interest thereon constitute special and limited obligations of the Issuer and are payable solely from amounts payable by the Borrower under the Loan Agreement and amounts otherwise available under this Indenture for the payment of the Bonds. Neither the Issuer, the State, nor any political subdivision thereof, other than the Issuer, which shall only be obligated to pay the Bonds from the Revenues

and other funds herein provided therefor, shall be obligated to pay the principal of, or the premium, if any, or interest on, the Bonds, and neither the faith and credit nor the taxing power of the Issuer, the State, or any political subdivision thereof is pledged to such payment. The issuance of the Bonds shall not directly or indirectly or contingently obligate the State or any political subdivision thereof to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment.

SECTION 5.02. Bond Fund.

(a) Bond Fund. There is hereby created and established a Bond Fund which shall constitute a special and separate fund to be held by the Trustee. The Bond Fund shall contain the following accounts: (i) a Revenue Account, (ii) a Bond Account, and (iii) an Optional Redemption Account, as special and separate accounts in the Bond Fund, which special and separate accounts are hereby created and established. The Trustee shall establish such subaccounts within each account as directed herein. Reference to the Bond Fund herein shall include reference to all accounts and subaccounts therein, unless otherwise stated.

(b) Revenue Account. The Borrower shall deposit with the Trustee on or before the twentieth (20th) day of each month the Gross Revenues at the times and in the amounts provided herein; provided, however, the Issuer and the Trustee acknowledge that, the Borrower shall not be required to deposit Gross Revenues earlier than five (5) Business Days from receipt thereof as set forth in Section 5(a) of the Agreement.

Earnings on all moneys held in the Revenue Account shall be retained in the Revenue Account. The Trustee shall immediately deposit the Gross Revenues, and other additional amounts directed by the Indenture to be deposited, in the Revenue Account. The Trustee shall apply amounts on the 25th day of each month in the Revenue Account as follows:

(i) first, to the payment of Trustee's fees and expenses then due and payable (however, to the extent Revenues are not available to pay fees and expenses, the Borrower will pay the Trustee directly);

(ii) second, to the Rebate Fund, any investment earnings or other amounts required to be so transferred as and when needed pursuant to Section 5.04 hereof;

(iii) third, to the Bond Account, an amount equal to one-sixth (1/6) of the interest due on the Series 2006 Bonds on the next Interest Payment Date and one-twelfth (1/12) of the principal amount due on the Series 2006 Bonds on the next Principal Payment Date (subject in both cases to pro rata adjustment for transfers prior to the first Interest Payment Date or first Principal Payment Date);

(iv) fourth, to the Reserve Fund, an amount sufficient to maintain

the amount on deposit therein at the Reserve Requirement;

(v) fifth, to the Replacement Reserve Fund, an amount equal to one-twelfth (1/12) of the Replacement Reserve Deposit; and

(vi) sixth, to the Borrower, any remaining amounts in the Revenue Account.

If the Trustee has not received payment required to be made by the Borrower under this Section 5.02(b) and the Gross Revenues are insufficient to satisfy items (i) through (v) of this Section 5.02(b), the Trustee shall notify the Borrower and the Guarantor within two (2) Business Days of such failure to deposit or insufficiency of amounts by telephone, telecopy or telegram and confirm such notification by written notice.

(c) Bond Account. The Trustee shall deposit in the Bond Account (i) moneys transferred from the Revenue Account as provided in Section 5.02(b)(iii) herein, (ii) moneys transferred from the Reserve Fund as provided in Section 5.05(b) herein, and (iii) any moneys directed by the Borrower to be deposited in the Bond Account pursuant to Section 5.04. Moneys on deposit in the Bond Account shall be applied solely to the payment of principal of and premium, if any, and interest on the Bonds. Earnings on all moneys held in the Bond Account shall be transferred to the Revenue Account.

(i) The Trustee shall apply moneys in the Bond Fund to pay the principal of and premium if any, and interest on the Bonds as such shall become due and payable (including accrued interest on any Bonds purchased or redeemed prior to maturity pursuant to this Indenture).

(ii) Any moneys which have been deposited in the Bond Fund for application to any of the foregoing mandatory sinking fund payments, and which are not needed for the payment of interest on the Bonds, shall be applied by the Trustee, if the Trustee is directed to do so in a Request of the Borrower received prior to the selection of Bonds for redemption, to the purchase of the applicable Bonds as and when and at such prices (including brokerage and other charges but excluding accrued interest) as the Borrower may in its discretion determine, except that the purchase price (excluding accrued interest) shall not exceed the principal amount of such Bonds. Any Bonds so purchased with moneys designated for a mandatory sinking fund payment shall be applied, to the extent of the full principal amount thereof, to reduce said mandatory sinking fund payment. All Bonds purchased pursuant to this paragraph shall be canceled by the Trustee and destroyed.

(iii) If the Borrower shall deposit Bonds of the applicable maturity with the Trustee at least sixty (60) days before any mandatory sinking fund payment date with respect to Bonds of such maturity together with instructions to the Trustee to apply the principal amount of such Bonds so delivered to the mandatory sinking fund payment due on that date with respect to Bonds of that maturity, such Bonds shall be applied, to the

extent of the full principal amount thereof, to reduce said mandatory sinking fund payment. All Bonds deposited pursuant to the provisions of this paragraph shall be canceled by the Trustee and destroyed.

(iv) In the event that the Borrower makes a prepayment pursuant to Section 8 or Section 12(c) of the Agreement, such prepayment shall be forthwith deposited in the Optional Redemption Account within the Bond Fund which the Trustee shall establish and maintain and shall be applied thereafter to the redemption of Bonds as promptly as practicable in accordance with the provisions of this Indenture. Earnings on all monies held in the Optional Redemption Account shall be transferred to the Revenue Account.

(v) The Trustee shall give notice to the Borrower and the Guarantor as specified in Section 5(d) of the Agreement, which notice shall be communicated in a manner designed to ensure the Borrower receives the notice at least two (2) Business Days prior to each Interest Payment Date, Maturity Date and Principal Payment Date of non-receipt of the amounts sufficient to satisfy Section 5(d) of the Agreement. Any verbal notice shall be supplemented by written notice. Failure by the Trustee to give notice pursuant to this paragraph, the non-receipt of any such notice on the part of the Borrower or the insufficiency of any such notice, shall not affect the payment obligations of the Borrower under the Agreement, including without limitation the timing thereof.

SECTION 5.03. Replacement Reserve Fund. The Trustee shall establish and maintain a separate trust fund designated as the Replacement Reserve Fund and shall deposit therein the amounts transferred from the Revenue Account as provided in Section 5.02(b)(v) of this Indenture. The Trustee shall apply moneys in such Fund not more often than once each month at the request of the Borrower only to the payment of capital items of repair and replacement with respect to the Project, provided that any requested disbursement for a contract in excess of $50,000 shall be accompanied by a certificate from an Independent Engineer appointed by the Borrower stating (i) the work requested is reasonable in scope, (ii) the work requested is reasonable in priority given the then existing physical needs of the facility, and (iii) that each contractor who is to receive a disbursement from the advance has satisfactorily completed the work for which disbursement (less any required retainage) is requested in such draw request. Investment earnings on amounts held in the Replacement Reserve Fund shall remain in such fund.

SECTION 5.04. Rebate Fund.

(a) Establishment. The Trustee shall establish a separate account for the Bonds designated the "Rebate Fund." Within the Rebate Fund, the Trustee shall maintain such other accounts as it is instructed by the Borrower as shall be necessary in order to comply with the terms and requirements of the Borrower's Tax Certificate. Absent an opinion of Bond Counsel that the exclusion from gross income for federal income tax purposes of interest on the Series 2006A Bonds will not be adversely affected, the Borrower shall cause to be deposited in the Rebate Fund such amounts as are required

Case 3:10-cv-00262-HRH  Document 1-2  Filed 07/14/10  Page 40 of 50

to be deposited therein pursuant to this Section and the Borrower's Tax Certificate. Subject to the transfer provisions provided in Subsections (a)(iii) and (b) below, all money at any time deposited in the Rebate Fund shall be held by the Trustee in trust for payment to the United States Treasury, and no other Person shall have any rights in or claim to such money. All amounts on deposit in the Rebate Fund for the Bonds shall be governed by this Section 5.04 and the Borrower's Tax Certificate, unless and to the extent the Borrower delivers to the Trustee an opinion of Bond Counsel that the exclusion from gross income for federal income tax purposes of interest on the Series 2006A Bonds will not be adversely affected if such requirements are not satisfied. The Trustee shall be deemed conclusively to have complied with such provisions if it follows the directions of the Borrower including supplying all necessary information in the manner provided in the Borrower's Tax Certificate, shall not be required to take any actions thereunder in the absence of written directions by the Borrower, and shall have no liability or responsibility to enforce compliance by the Borrower with the terms of the Borrower's Tax Certificate. The Trustee shall have no responsibility to make any independent calculations or determinations or to review the Borrower's calculations hereunder.

(i)     Rebatable Arbitrage Computation. The Borrower shall cause to be calculated the amount of rebatable arbitrage within fifty-five (55) days after the end of each fifth Bond Year, in accordance with Section 148(f)(2) of the Code and Section 1.148-3 of the Treasury Regulations (taking into account any applicable exceptions with respect to the computation of the rebatable arbitrage, described, if applicable, in the Borrower's Tax Certificate (e.g., the temporary investments exceptions of Section 148(f)(4)(B) and (C) of the Code or Section 1.148-7(d) of the Treasury Regulations), and taking into account whether the election pursuant to Section 148(f)(4)(C)(vii) of the Code (the "1½% Penalty") has been made), for this purpose treating the last day of the applicable Bond Year as a computation date, within the meaning of Section 1.148-1(b) of the Treasury Regulations (the "Rebatable Arbitrage"). The Borrower shall obtain expert advice as to the amount of the Rebatable Arbitrage to comply with this Section.

(ii)     Rebatable Arbitrage Transfer. Within fifty-five (55) days after the end of each Bond Year (as such term is defined in the Borrower's Tax Certificate), upon the written request of the Borrower an amount shall be deposited to the Rebate Fund by the Trustee from deposits by the Borrower held in the Bond Fund, or from available investment earnings on amounts, if and to the extent required, so that the balance in the Rebate Fund shall equal the amount of Rebatable Arbitrage so calculated in accordance with (i) of this Subsection (a). In the event that immediately following the transfer required by the previous sentence, the amount then on deposit to the credit of the Rebate Fund exceeds the amount required to be on deposit therein, upon written request of the Borrower, the Trustee shall withdraw the excess from the Rebate Fund and then credit the excess to the Bond Fund.

(iii)     Payment to the Treasurer. The Trustee shall pay, as directed by request of the Borrower, to the United States Treasurer, out of amounts in the Rebate Fund,

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 41 of 50

(A)    not later than 60 days after the end of (X) the fifth Bond Year, and (Y) each applicable fifth Bond Year thereafter, an amount that, together with all previous rebate payments, is equal to at least 90% of the Rebatable Arbitrage calculated as of the end of such Bond Year; and

(B)    not later than 60 days after the payment of all the Series 2006A Bonds, an amount equal to 100% of the Rebatable Arbitrage calculated as of the date of such payment and any income attributable to the Rebatable Arbitrage determined to be due and payable, computed in accordance with Section 1.148-3 of the Treasury Regulations.

In the event that, prior to the time of any payment required to be made from the Rebate Fund, the amount in the Rebate Fund is not sufficient to make such payment when such payment is due, the Borrower shall calculate or cause to be calculated the amount of such deficiency and deposit an amount received from any legally available source equal to such deficiency prior to the time such payment is due. Each payment required to be made pursuant to this Subsection (a) shall be made to the Internal Revenue Service Center, Ogden, Utah 84201 on or before the date on which such payment is due, and shall be accompanied by Internal Revenue Service Form 8038-T or shall be made in such other manner as provided under the Code.

(b)    Disposition of Unexpended Funds. Any funds remaining in the Rebate Fund after redemption and payment in full of the Series 2006A Bonds and the payments described in Subsection (a)(iii) above being made may be withdrawn by the Borrower and utilized in any manner by the Borrower.

(c)    Survival of Defeasance. Notwithstanding anything in this Section to the contrary, the obligation to remit the Rebatable Arbitrage to the United States and to comply with the requirements of this Section shall survive the defeasance or payment in full of the Series 2006A Bonds.

(d)    Recordkeeping. The Borrower (or, in the case of a failure by the Borrower, the Trustee) shall retain records of all determinations made under Section 5.04 of this Indenture (and, in the case of the Trustee, only those records received by the Trustee) until six years after the complete retirement of the Series 2006A Bonds.

(e)    Investment of Amounts in Rebate Fund. The Trustee shall invest all amounts held in the Rebate Fund in Eligible Securities as instructed in writing by the Borrower and shall otherwise hold such moneys uninvested, and the Borrower shall be responsible for such instructions complying with the Borrower's Tax Certificate. Money shall not be transferred from the Rebate Fund except as provided in Subsections (a)(ii), (a)(iii) and (b) above.

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 42 of 50

SECTION 5.05. Reserve Fund.

(a)    The Trustee shall establish and maintain and hold in trust a separate
fund designated the "Reserve Fund." All amounts in the Reserve Fund shall be used and
withdrawn by the Trustee solely for the purpose of making up any deficiency in the Bond
Fund, including amounts for the payment or redemption of all Bonds then Outstanding. If
moneys are withdrawn for such purpose, the Trustee shall promptly notify the Borrower of
such withdrawal, and, in accordance with Section 5(c) of the Loan Agreement, the
Borrower shall immediately transfer to the Trustee, following the date of notice from the
Trustee of the amount due, for deposit in the Reserve Fund, the lesser of (i) the amount
of such withdrawal, or (ii) the amount necessary to restore the Reserve Requirement.

(b)    Moneys held in the Reserve Fund shall be invested at the written
direction of the Borrower in Eligible Securities. Amounts on deposit in the Reserve Fund
shall be valued at market value annually on or before each August 1 (commencing August
1, 2007) or the next immediately preceding Business Day if such August 1 is not a
Business Day (a "Valuation Date"), on the Business Day immediately following a
redemption made hereunder or on any other date at the written request of the Borrower.
If, on any such date, the amount held in the Reserve Fund, including investment earnings,
is equal to less than one hundred percent (100%) of the Reserve Requirement, the Trustee
shall notify the Borrower of the amount necessary to increase the amount on deposit in the
Reserve Fund to the Reserve Requirement, and the Borrower shall transfer to the Trustee,
in four equal quarterly installments due on the first Business Day of the next quarter (such
quarters being comprised of the periods from August 1 to October 31, November 1 to
January 31, February 1 to April 30 and May 1 to July 31 of the applicable year),
commencing August 1, November 1, February 1 and May 1, as applicable, following the
date of such notice, such amount as may be necessary to increase the balance therein to
the Reserve Requirement. If the amount held in the Reserve Fund on any Valuation Date
or on any other date on which there is delivered a Request of the Borrower for the
valuation of securities in the Reserve Fund (which shall be valued at market value)
exceeds the Reserve Requirement, such excess shall be transferred to the Bond Fund.
In making any valuations of Eligible Securities hereunder, the Trustee may utilize such
pricing services as may be regularly available to it, including those within its regular
accounting system and conclusively rely thereon.

SECTION 5.06. Investment of Moneys in Funds. Except as otherwise provided in
Section 10.03 hereof all moneys in any of the funds and accounts established pursuant to
this Indenture shall be invested by the Trustee solely in such Eligible Securities as are
specified in a Request of the Borrower, provided, however, that, if the Borrower does not
file such a Request with the Trustee, the Trustee shall invest to the extent practicable in
investments described in clause (g) of the definition of the term "Eligible Securities" in
Section 1.01 of this Indenture.

Except as otherwise provided in written instructions of the Borrower which the
Borrower shall state in writing are given in accordance with the Borrower's Tax Certificate

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 43 of 50

and subject to Section 5.04(b), all interest, profits and other income received from the investment of moneys shall be deposited in the Project Fund when received until all moneys in that fund have been expended and thereafter shall be deposited in the Revenue Account; provided, however, that no interest, profits or other income from the investment of the Reserve Fund may be transferred from the Reserve Fund unless the amount on deposit in the Reserve Fund immediately after such transfer will be at least equal to the Reserve Requirement.

Subject to Section 10.03 hereof, investments in any and all funds and accounts established pursuant to this Indenture (other than the Rebate Fund) may be commingled for purposes of making, holding and disposing of investments, notwithstanding provisions herein for transfer to or holding in a particular fund amounts received or held by the Trustee hereunder, provided that the Trustee shall at all times account for such investments strictly in accordance with the particular funds to which they are credited and otherwise as provided in this Indenture. The Trustee may act as principal or agent in the making or disposing of any investment. The Trustee may sell or present for redemption, any securities so purchased whenever it shall be necessary to provide moneys to meet any required payment, transfer, withdrawal or disbursement from the fund or account to which such securities are credited, and the Trustee shall not be liable or responsible for any loss resulting from such investment.

Only cash and Eligible Securities may be credited to the Reserve Fund. Investments purchased with funds on deposit in the Reserve Fund shall have an average aggregate weighted term to maturity not greater than five years (the final termination date of any investment consisting of a repurchase or investment agreement being the maturity of such investment for purposes of this limitation).

The Issuer (and the Borrower by its execution of the Agreement) acknowledges that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant the Issuer or the Borrower the right to receive from the Trustee brokerage confirmations of security transactions as they occur, the Issuer and the Borrower specifically waive receipt of such confirmations to the extent permitted by law. The Trustee will furnish the Borrower periodic cash transaction statements which include detail for all investment transactions made by the Trustee hereunder. The Trustee shall value investments at the market value thereof.

The Trustee or any of its affiliates may act as sponsor or manager in connection with any investments made by the Trustee hereunder. Any Eligible Securities that are registerable securities shall be registered in the name of the Trustee.

Notwithstanding anything to the contrary herein, in making any valuations of the investments hereunder, the Trustee may utilize and rely on computerized securities pricing services that may be available to it, including those available through its regular accounting system.

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 44 of 50

SECTION 5.07. Amounts Remaining in Funds and Accounts. Any amounts remaining in the Bond Fund or any other fund or account established hereunder after payment in full of the Bonds (or after provision for payment thereof as provided herein), the fees, charges and expenses of the Trustee and the Issuer, and the Rebate Requirement (as defined in the Borrower's Tax Certificate) shall belong and be paid to the Borrower by the Trustee.

ARTICLE VI
COVENANTS

SECTION 6.01. Faithful Performance. The Issuer will faithfully perform at all times any and all of its covenants, undertakings, stipulations and provisions contained in this Indenture and in each and every Bond executed, authenticated, and delivered hereunder; the Issuer, but solely with amounts payable from the Borrower, will pay or cause to be paid to the Trustee from amounts received in respect of the Agreement, the Promissory Note and this Indenture, the principal of, and premium, if any, and interest on, every Bond issued hereunder on the dates, at the places and in the manner prescribed in the Bonds, in lawful money of the United States of America; and will cause such amounts received to be deposited with the Trustee in immediately available funds prior to the due date of each installment of principal and interest and prior to the maturity of any Bond in amounts sufficient to pay such installment when due; provided, however, that the principal of, and premium, if any, and interest on, any Bond is not and shall not be deemed to represent a general obligation or pledge of the faith or credit of the Issuer or the State or grant to the Holder of any Bond any right to have the Issuer or the State levy any taxes or appropriate any funds to the payment of principal of, or premium, if any, or interest on, the Bonds, such payment to be made solely and only out of the money received pursuant to the Agreement, the Promissory Note, and the Funds established and maintained with the Trustee pursuant to the requirements of this Indenture and appropriated to the payment of the Bonds by this Indenture.

SECTION 6.02. Extension of Payment of Bonds. The Issuer shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or the time of payment of any of the claims for interest by the purchase or funding of such Bonds or claims for interest or by any other arrangement except with the written consent of the Bondholders pursuant to Section 9.02 hereof and, if the maturity of any of the Bonds or the time of payment of any such claims for interest shall be extended without the written consent of the Bondholders, such Bonds or claims for interest shall not be entitled, in case of any default hereunder, to the benefits of this Indenture, except subject to the prior payment in full of the principal of all of the Bonds then Outstanding and of all claims for interest thereon which shall not have been so extended. Nothing in this Section shall be deemed to limit the right of the Issuer to issue bonds for the purpose of refunding any Outstanding Bonds, and such issuance shall not be deemed to constitute an extension of maturity of Bonds.

SECTION 6.03. Lien of Indenture. The Issuer will not create or suffer to be created any lien having priority or preference over the lien of this Indenture upon the Trust Estate or any part thereof, other than the security interests granted by it to the Trustee. The Issuer agrees that no obligations, the payment of which are secured by money or amounts derived from the Agreement, the Promissory Note and the other sources provided herein, will be issued by it except in accordance with the provisions of this Indenture.

SECTION 6.04. Validity of Issuer Actions. The Issuer is duly authorized under the constitution and laws of the State to create and issue the Bonds, to make the proceeds thereof available to the Borrower for the Project or other lawful activities of the Borrower, and to execute this Indenture. All necessary action and proceedings on its part to be taken for the creation and issuance of the Bonds and the execution and delivery of this Indenture have been duly and effectively taken, and the Bonds in the hands of the Holders thereof are and will be valid and enforceable special obligations of the Issuer in accordance with their terms.

SECTION 6.05. Pledge of the State. The State pledges to and agrees with the Holders of the Bonds that the State will not limit or alter the rights and powers vested in the Issuer by the Act to fulfill the terms of the contracts made by the Issuer under this Indenture with the Holders of Bonds, or in any way impair the rights and remedies of the Holders of Bonds until the Bonds, together with the interest on them with interest on unpaid installments of interest, and all costs and expenses in connection with an action or proceeding by or on behalf of the Holders of the Bonds, are fully met and discharged. This pledge is included in this Indenture under the specific authority of 44.88.130 of the Act.

SECTION 6.06. Accounting Records and Financial Statements.

(a)    The Trustee shall at all times keep, or cause to be kept, proper books of record and account, prepared in accordance with the Trustee's accounting practices for books of record and account relating to similar trust accounts and in accordance with the customary standards of the corporate trust industry for such books of record and account, in which complete and accurate entries shall be made of all transactions made by it relating to the proceeds of Bonds, the Revenues, the Agreement and all funds and accounts established pursuant to this Indenture. Such books of record and account shall be available for inspection by the Issuer, the Holders and the Borrower upon reasonable notice and under reasonable circumstances. The Trustee may establish such funds and accounts as it deems necessary or appropriate to perform its duties hereunder.

(b)    The Trustee shall furnish to the Borrower (and the Borrower shall provide to the Holders), at intervals acceptable to such parties but in any event at least quarterly, a complete financial statement (which may be in the form of its regular statements) covering receipts, disbursements, allocation and application of Revenues and the proceeds of the Bonds made by the Trustee, provided that the Trustee shall not be obligated to deliver an accounting for any fund or account that (i) has a balance of $0.00 and (ii) has not had any activity since the last reporting date.

SECTION 6.07. Tax Covenants.

(a)     The Issuer and the Borrower each covenant that it shall not take any action, or fail to take any action, if such action or failure to take such action would result in the interest on the Series 2006A Bonds not being excluded from gross income for federal income tax purposes under Section 103 of the Code. Without limiting the generality of the foregoing, the Issuer covenants that it will comply with the requirements of the Issuer's Tax Certificate and the Borrower covenants that it will comply with the requirements of the Borrower's Tax Certificate, which are each incorporated herein as if fully set forth herein. This covenant shall survive the payment in full or the defeasance of the Series 2006A Bonds.

(b)     In the event that at any time the Borrower is of the opinion that for purposes of this Section it is necessary or helpful to restrict or limit the yield on the investment of any moneys held by the Trustee under this Indenture, anything in Section 5.06 of this Indenture to the contrary notwithstanding, the Borrower shall so instruct the Trustee in a Request of the Borrower accompanied by a supporting Opinion of Bond Counsel and the Trustee shall take such action as may be directed in accordance with such instructions; provided, however, the Borrower may not instruct the Trustee to invest moneys in investments other than Eligible Securities.

(c)     Notwithstanding any provisions of this Section, if the Borrower shall provide to the Trustee an Opinion of Bond Counsel to the effect that any specified action required under this Section is no longer required or that some further or different action is required to maintain the exclusion from federal income tax of interest on the Series 2006A Bonds, the Trustee may conclusively rely on such opinion in complying with the requirements of this Section and the Borrower's Tax Certificate, and the covenants hereunder shall be deemed to be modified in that extent.

SECTION 6.08. Other Covenants, Amendment of Certain Agreements.

(a)     The Trustee shall promptly collect all amounts due from the Borrower pursuant to the Agreement and diligently enforce and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Issuer under the Agreement and assigned to it pursuant to Section 5.01(b) hereof.

(b)     The Issuer and the Borrower shall not amend, modify or terminate any of the terms of the Agreement or the Deed of Trust or consent to any amendment, modification or termination thereof without the prior written consent of the Trustee. The Trustee shall give such written consent if but only if (1) it has received a written representation from the Issuer to the effect that such amendment or modification will not materially and adversely affect the interests of the Holders of the Bonds (which written representation may be based on representations of other parties in accordance with the provisions of Section 1.02 hereof); provided that, if an Event of Default described in paragraph (a), (b) or (d) of Section 7.01 hereof has occurred and is continuing, the Trustee

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 47 of 50

rather than the Issuer shall make a determination that such amendment or modification will not materially and adversely affect the interests of the Holders of the Bonds (provided that, in making such determination, the Trustee may conclusively rely on written representations of financial consultants or advisors or the opinion or advice of counsel), (2) it has delivered a copy of such proposed amendment to the Holders, and (3) it has received an Opinion of Bond Counsel to the effect that such amendment will not affect the exclusion of interest on the Series 2006A Bonds from gross income of the Holders under federal income tax laws; provided that no such amendment, modification or termination shall reduce the amount of Base Loan Payments to be made to the Trustee by the Borrower pursuant to the Agreement, or extend the time for making such payments, without the written consent of all of the Holders of the Bonds then Outstanding; provided, however, that the Trustee may amend, modify or terminate any of terms of the Agreement or Deed of Trust, or consent to any such amendment, modification or termination, for the purpose of curing any ambiguity, patent error, inconsistency, or omission, in such documents.

SECTION 6.09. The Guaranty. If the Borrower has failed to pay amounts due and payable pursuant to the terms of the Agreement or this Indenture, the Trustee shall draw on the Guaranty and, unless otherwise directed by the Indenture, shall deposit such amounts in the Revenue Account of the Bond Fund and immediately apply such amounts in accordance with Section 5.02 of this Indenture.

SECTION 6.10. Further Assurances. The Issuer will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such indentures supplemental hereto and such further acts, instruments and transfers for the better conveying, assuring, transferring, assigning, pledging and hypothecating unto the Trustee the right, title and interest of the Issuer in the Loan Agreement (with certain reservations and exceptions noted in Section 28 of the Agreement) and the Promissory Note, as security for the payment of the principal of, and premium, if any, and interest on, the Bonds in the manner and to the extent contemplated herein.

SECTION 6.11. Continuing Disclosure. Pursuant to Section 16(e) of the Agreement, the Borrower has undertaken all responsibility for compliance with continuing disclosure requirements pursuant to Securities and Exchange Commission Rule 15c2-12(b)(5) and the Issuer shall have no liability to the Holders of the Bonds or any other person with respect to Securities and Exchange Commission Rule 15c2-12. The Trustee hereby covenants and agrees that, subject to the provisions of this Indenture, it will comply with and carry out all of the provisions of the Continuing Disclosure Agreement and Section 16(e) of the Agreement applicable to it. Notwithstanding any other provision of this Indenture, failure of the Borrower or the Trustee to comply with the Continuing Disclosure Agreement shall not be considered a Loan Default Event or an Event of Default hereunder; provided, however, the Trustee, at the written request of the Holders of at least a majority in aggregate principal amount of Outstanding Bonds, shall (but only to the extent the Trustee has been tendered funds in an amount satisfactory to it or it has been otherwise indemnified from and against any loss, liability, cost or expense, including without limitation, fees and expense of its counsel and agents and additional fees and charges of

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 48 of 50

the Trustee) take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower to comply with its obligations under Section 16(e) of the Agreement.

SECTION 6.12. Annual Notice of Principal Outstanding. The Trustee hereby covenants and agrees to deliver to the Issuer on or before August 31 of each year a statement setting forth the principal amount of Bonds Outstanding under this Indenture as of June 30 of such year.

## ARTICLE VII
## EVENTS OF DEFAULT; REMEDIES ON DEFAULT

SECTION 7.01. Events of Default; Acceleration; Waiver of Default. If one or more of the following events ("Events of Default") shall happen, that is to say —

(a)    if default shall be made by the Borrower in the due and punctual payment of the principal of, or premium (if any) on, any Bond as the same shall become due and payable (whether at maturity, by proceedings for redemption, by declaration or otherwise);

(b)    if default shall be made by the Borrower in the due and punctual payment of any installment of interest on any Bond when and as such interest installment shall become due and payable;

(c)    if default shall be made by the Borrower in the performance or observance of any of the covenants, agreements or conditions on its part in this Indenture or in the Bonds contained, other than as referred to in (a), (b), (d), (e), and (f) of this Section 7.01 and such default shall have continued for a period of thirty (30) days after written notice thereof specifying such default and requiring the same to be remedied, shall have been given to the Borrower by the Trustee (with a copy to Issuer), or to the Borrower and the Trustee (with a copy to be provided to the Issuer by the Trustee) by the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time Outstanding;

(d)    if a Loan Default Event has occurred and is continuing;

(e)    if a default under the Deed of Trust has occurred and is occurring; or

(f)    if default shall be made by the Borrower's failure to perform or observe its covenant and agreement contained in Section 5.02(b) of this Indenture and the Borrower shall have failed to correct such default within twenty-five (25) calendar days following such failure to perform after notice thereof specifying such default and requiring the same to be remedied shall have been given to the Borrower by the Trustee (with a copy to the Issuer).

In each and every such case during the continuance of an Event of Default, unless the principal of all the Bonds shall have already become due and payable, the Trustee, by notice in writing to the Borrower (with a copy to Issuer), may, and shall, upon the written request of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, declare the principal of all the Bonds then Outstanding, and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Bonds contained to the contrary notwithstanding. Interest on the Bonds shall cease to accrue from and after the date of declaration of any such acceleration by the Trustee. This provision, however, is subject to the condition that if, at any time after the principal of the Bonds shall have been so declared due and payable and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Trustee, together with amounts then held in the Bond Fund, a sum sufficient to pay all principal on the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal at the rate borne by the respective Bonds, and the reasonable fees and expenses of the Trustee (including but not limited to those of its attorneys), and any and all other defaults known to the Trustee (other than in the payment of principal of and interest on the Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, then, and in every such case, the Holders of at least a majority in aggregate principal amount of the Bonds then Outstanding, by written notice to the Issuer and to the Trustee (with a copy to be provided to Borrower by the Trustee), may, on behalf of the Holders of all of the Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

Notwithstanding the foregoing, no default specified in (c) above shall constitute an Event of Default unless the Borrower shall have failed to correct such default within the applicable 30-day period; provided, however, that if the default shall be such that it can be corrected, but cannot be corrected within such period, it shall not constitute an Event of Default if corrective action is instituted by the Borrower within the applicable period and diligently pursued until the default is corrected.

After any declaration of acceleration under this Section 7.01 the Trustee shall immediately declare all indebtedness payable under Section 5(a) of the Agreement with respect to the Bonds to be immediately due and payable in accordance with Section 8(d) of the Agreement and may exercise and enforce such rights as exist under the Agreement.

Upon the occurrence of an Event of Default hereunder of which the Trustee has knowledge, the Trustee shall immediately notify the Issuer, the Borrower, the Guarantors and the Holders in writing by first class mail of such Event of Default.

AIDEA/Sports Facilities Revenue Bonds, Series 2006A and 2006B
Trust Indenture
I:\Docs\37300724\Trust Indenture Final.wpd

Page 45

Case 3:10-cv-00262-HRH   Document 1-2   Filed 07/14/10   Page 50 of 50